## CITY OF DETROIT ET AL. *v.* MURRAY CORPORATION OF AMERICA ET AL.

No. 18. Argued November 13–14, 1957.—Decided March 3, 1958.*

---

*Together with No. 36, *City of Detroit et al.* v. *Murray Corporation of America et al.*, on certiorari to the same Court.

490

 

*Vance G. Ingalls* argued the cause for the City of Detroit, Michigan, and *Hobart Taylor, Jr.* for the County of Wayne, Michigan. On the brief were *Mr. Ingalls, Julius C. Pliskow* and *G. Edwin Slater* for the City of Detroit, and *Mr. Taylor* and *Albert E. Champney* for the County of Wayne, appellants-petitioners.

*Roger Fisher* argued the cause for the United States, appellee-respondent. On the brief were *Solicitor General Rankin, Assistant Attorney General Rice, J. Dwight Evans, Jr., Robert N. Anderson, Lyle M. Turner* and *H. Eugene Heine, Jr.*

*Victor W. Klein* argued the cause for the Murray Corporation of America, appellee-respondent. With him on the brief were *William M. Saxton* and *Meyer H. Dreety.*

Briefs of *amici curiae* urging reversal were filed by *Robert V. Baker* and *Wm. J. P. Aberg* for the City of Kenosha, Wisconsin, and *Roger Arnebergh, Peter Campbell Brown, E. R. Christensen, J. Elliott Drinard, Marshall F. Hurley, J. Frank McKenna, John C. Melaniphy* and *Charles S. Rhyne* for the National Institute of Municipal Law Officers.

MR. JUSTICE BLACK delivered the opinion of the Court.

This is the third in a series of cases from the State of Michigan decided today involving a claim of constitutional tax immunity.

In 1952 Murray Corporation was acting as a subcontractor under a prime contract for the manufacture of airplane parts between two other private companies and the United States. From time to time Murray received partial payments from the two prime contractors as it performed its obligations under the subcontract. By agreement, title to all parts, materials and work in process acquired by Murray in performance of the subcontract vested in the United States upon any such partial payment, even though Murray retained possession.

On January 1, 1952, the City of Detroit and the County of Wayne, Michigan, each assessed a tax against Murray which in part was based on the value of materials and work in process in its possession to which the United States held legal title under the title-vesting provisions of the subcontract.[1] Murray paid this part of each tax under protest and then sued in a Federal District Court for a refund from the city and county. It contended that full title to the property was in the United States and that the taxes infringed the Federal Government's immunity from state taxation to the extent they were based on such property. The Government intervened on Murray's behalf. On motion for summary judgment the District Court entered judgment for Murray and the Court of Appeals for the Sixth Circuit affirmed. 234 F. 2d 380. From this decision the city and county both appealed and petitioned for certiorari. We granted certiorari and

---

[1] The relevant statutory provisions are set forth in full in 6 Mich. Stat. Ann., 1950, §§ 7.1, 7.10, 7.81, and Tit. VI, c. II, § 1, and Tit. VI, c. IV, §§ 1, 7, 26, 27, of the Charter of the City of Detroit. They provide in part that "The owners or persons in possession of any personal property shall pay all taxes assessed thereon. . . . In case any person by agreement or otherwise ought to pay such tax, or any part thereof, the person in possession who shall pay the same may recover the amount from the person who ought to have paid the same . . . ."

postponed the question of jurisdiction on appeal to the hearing on the merits. 352 U. S. 960, 963. The appeal was proper. 28 U. S. C. § 1254 (2).

We believe that this case is also controlled by the principles expressed in our opinions in Nos. 26 and 37, *ante,* pp. 466, 484, and that the taxes challenged here do not violate the Constitution.[2] These taxes were not levied directly against the United States or its property. To the contrary they were imposed on Murray, a private corporation, and there was no effort to hold the United States or its property accountable. In fact Michigan expressly exempts from taxation all public property belonging to the United States, 6 Mich. Stat. Ann., 1950, § 7.7, and these taxes were assessed from the beginning "subject to prior rights of the Federal Government." Cf. *S. R. A.* v. *Minnesota,* 327 U. S. 558, 559, 561; *City of New Brunswick* v. *United States,* 276 U. S. 547.

The taxes imposed on Murray were styled a personal property tax by the Michigan statutes and it relies upon this to support its contention that they were actually laid against government property. However in passing on the constitutionality of a state tax "we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Lawrence* v. *State Tax Commission,* 286 U. S. 276, 280. Consequently in determining whether these taxes violate the Government's constitutional immunity we must look through form and behind labels to substance. This is at least as true to uphold a state tax as to strike one down. Cf. *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 443–445;

---

[2] For purposes of this case we assume that the United States had full title to the property not just a bare security interest. But cf. *S. R. A.* v. *Minnesota,* 327 U. S. 558, affirming 213 Minn. 487, 7 N. W. 2d 484, and 219 Minn. 493, 18 N. W. 2d 442; *Land O'Lakes Dairy Co.* v. *Wadena County,* 338 U. S. 897, affirming 229 Minn. 263, 39 N. W. 2d 164; *Offutt Housing Co.* v. *Sarpy County,* 351 U. S. 253.

*Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542. Due regard for the State's power to tax requires no less. As applied—and of course that is the way they must be judged—the taxes involved here imposed a levy on a private party possessing government property which it was using or processing in the course of its own business. It is not disputed that Michigan law authorizes the taxation of the party in possession under such circumstances. Cf. *Detroit Shipbuilding Co.* v. *Detroit,* 228 Mich. 145, 199 N. W. 645; *City of Detroit* v. *Gray,* 314 Mich. 516, 22 N. W. 2d 771.

In their practical operation and effect the taxes in question are identical to those which we upheld in Nos. 26 and 37 on persons using exempt real property. We see no essential difference so far as constitutional tax immunity is concerned between taxing a person for using property he possesses and taxing him for possessing property he uses when in both instances he uses the property for his own private ends. Nor have we been pointed to anything else which would bar a State from taxing possession in such circumstances. Cf. *Carstairs* v. *Cochran,* 193 U. S. 10. Lawful possession of property is a valuable right when the possessor can use it for his own personal benefit.

It is true that the particular Michigan taxing statutes involved here do not expressly state that the person in possession is taxed "for the privilege of using or possessing" personal property, but to strike down a tax on the possessor because of such verbal omission would only prove a victory for empty formalisms. And empty formalisms are too shadowy a basis for invalidating state tax laws. Cf. *Henneford* v. *Silas Mason Co.,* 300 U. S. 577, 582. In the circumstances of this case the State could obviate such grounds for invalidity by merely adding a few words to its statutes. Yet their operation and practical effect would remain precisely the same.

There is no claim that the challenged taxes discriminate against persons holding government property. To the contrary the tax is a general tax which applies and has been applied throughout the State. If anything the economic burden on the United States is more remote and less certain than in other cases where this Court has upheld taxes on private parties. Of course the Government will eventually feel the financial burden of at least some of the tax but the one principle in this area which has heretofore been clearly settled is that the imposition of an increased financial burden on the Government does not by itself invalidate a state tax.

The respondents rely heavily on *United States* v. *Allegheny County,* 322 U. S. 174. Petitioners on the other hand contend that the decision in *Allegheny* is inconsistent with the general trend of our decisions in this field, that it has already been distinguished to the point where it retains no meaningful vitality and that it is erroneous. However that may be, we do not think that case is controlling, essentially for the reasons set forth in *United States* v. *City of Detroit, ante,* p. 466. In *Allegheny* the Court emphasized that the tax against Mesta Machine Company was, in its view, a general property tax laid on government property as such. The Court pointed out that the State had "made no effort to segregate Mesta's interest and tax it." The question was expressly reserved whether the State could tax a person possessing government property for the possession and use of such property in connection with his own profit-making activities. Here, however, state law specifically authorizes assessment against the person in possession. And the taxing authorities were careful not to attempt to tax the Government's interest in the property.

In all important particulars the taxes imposed here are very similar to that upheld in *Esso Standard Oil Co.* v. *Evans,* 345 U. S. 495, on the storage of gasoline for the

United States. A tax on storage is not intrinsically different from a tax on possession, at least where in both instances the private party is holding the property for his own gain. The tax in *Esso* was measured by the quantity of government gasoline stored while the taxes here are measured by the value of government property possessed but such technical distinction is of no significance in determining whether the Constitution bars this tax and is completely unrelated to any rational basis for governmental tax immunity.

We find nothing in the Constitution which compels us to strike down these state taxes. There was no discrimination against the Federal Government, its property or those with whom it does business. There was no crippling obstruction of any of the Government's functions, no sinister effort to hamstring its power, not even the slightest interference with its property. Cf. *M'Culloch* v. *Maryland,* 4 Wheat. 316. In such circumstances the Congress is the proper agency, as we pointed out in *United States* v. *City of Detroit,* to make the difficult policy decisions necessarily involved in determining whether and to what extent private parties who do business with the Government should be given immunity from state taxes.

The judgment of the Court of Appeals is reversed and the cause is remanded for further proceedings not inconsistent with this opinion. *It is so ordered.*

Opinion of MR. JUSTICE FRANKFURTER.*

Adjustment of the interpenetrating factors involved in the Nation-State relation of our federal system, insofar as they are amenable to adjudication, is a subtle and complicated process. It precludes easy application even

*[NOTE: This opinion applies also to No. 26, *United States* v. *City of Detroit, ante,* p. 466, and No. 37, *United States* v. *Township of Muskegon, ante,* p. 484.]

of accepted legal formulas. Particularly is this true when the taxing power of the States is asserted against claims of intrusion into areas reserved to the Nation. In this domain it is asking too much for rules of certainty and simplicity in application that are hardly to be found in any live branch of the law. Even the Rule Against Perpetuities has only precarious certainty. The necessity for judicial accommodation between the intersecting interests of the States' power to tax and the concerns of the Nation in carrying on its government presents problems solutions for which cannot be sought by a formula assuring a bright, straight line of decisions. Accordingly, we have been admonished in the leading modern case dealing with these problems that they require "the observing of close distinctions in order to maintain the essential freedom of government in performing its functions, without unduly limiting the taxing power which is equally essential to both Nation and State under our dual system." *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 150.

The diversity of views expressed in these cases, even when there is concurrence in result, suggests the desirability of recalling, to use an old-fashioned phrase, "first principles." After all, we are dealing with problems that have, howsoever they may have appeared in particular situations, an unbroken history of nearly a century and a half. Temerarious as the claim may appear, there is a residuum of continuity in the reconciliation that the numerous cases since *M'Culloch* v. *Maryland,* 4 Wheat. 316 (1819), have made between the power of the States to tax and the restriction against laying a tax upon "the Government, its property or officers." *James* v. *Dravo Contracting Co., supra,* at 149. The governing principles, as Chief Justice Marshall himself formulated them, bear quotation:

" 'That all subjects to which the sovereign power of a State extends, are objects of taxation; but those

over which it does not extend are, upon the soundest principles, exempt from taxation.'

" 'That the sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission; but not to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States.'

" 'That the attempt to use the power of taxation on the means employed by the government of the Union in pursuance of the Constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give.'

" 'That the States have no power by taxation, or otherwise, to retard, impede, burden, or in any manner control the operation of the constitutional laws enacted by Congress, to carry into execution the powers vested in the General government.' " *Weston* v. *City Council of Charleston,* 2 Pet. 449, 467, as quoted by Mr. Justice Bradley in *Railroad Co.* v. *Peniston,* 18 Wall. 5, 38–39 (dissenting opinion).

No less helpful in giving directions for the path of solution to our immediate problems are the comments on these principles by Mr. Justice Bradley, whose powers of penetrating analysis, particularly in this field, were in my view second to none.

"Whilst no one disputes the general power of taxation in the States, which is so elaborately set forth in the opinion of the majority, it must be conceded that there are limits to that power. The States cannot tax the powers, the operations, or the property of the United States, nor the means which it employs to carry its powers into execution. The government of the United States, within the scope of its powers, is supreme, and cannot be interfered with or impeded in their exercise.

"The case differs *toto cœlo* from that wherein the government enters into a contract with an individual or corporation to perform services necessary for carrying on the functions of government—as for carrying the mails, or troops, or supplies, or for building ships or works for government use. In those cases the government has no further concern with the contractor than in his contract and its execution. It has no concern with his property or his faculties independent of that. How much he may be taxed by, or what duties he may be obliged to perform towards, his State is of no consequence to the government, so long as his contract and its execution are not interfered with. In that case the contract is the means employed for carrying into execution the powers of the government, and the contract alone, and not the contractor, is exempt from taxation or other interference by the State government." *Railroad Co.* v. *Peniston, supra,* at 41–42 (dissenting opinion).

When Mr. Chief Justice Hughes quoted the latter paragraph in support of the decision in *James* v. *Dravo Contracting Co., supra,* at 155, he impliedly indicated that some decisions that gave government contractors immunity from taxation for their property, profits, or purchases deviated from the traditional doctrines of implied governmental immunity, and that the decision in the *Dravo* case was essentially a return to orthodoxy as Mr. Justice Bradley had elucidated it. I venture to say that whatever deviations or even aberrations from true doctrine cases here and there and now happily laid to rest may disclose, there is a residuum of continuity over the long course of judicial adjustment of the States' power to tax and the limits placed upon it by the implied immunity of the National Government from the demands of the state tax collectors. No decision has ever questioned that a tax cannot be laid upon "the Government,

its property or officers," *James* v. *Dravo Contracting Co.*, *supra,* at 149, or, as it was phrased in *United States* v. *Allegheny County,* 322 U. S. 174, 177, "that possessions, institutions, and activities of the Federal Government itself in the absence of express congressional consent are not subject to any form of state taxation." This at least has been a bright straight line running undeviatingly through the decisions of this Court. See *Van Brocklin* v. *Tennessee,* 117 U. S. 151; *United States* v. *Alabama,* 313 U. S. 274, 279.

As Mr. Chief Justice Stone stated for a unanimous court in *Alabama* v. *King & Boozer,* 314 U. S. 1, 9, the application, and therefore the outcome, in cases like those before us of these general principles "turns on the terms of the contract and the rights and obligations of the parties under it." Nothing better illustrates the truth of this statement than a comparison of *King & Boozer* with *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, a case whose relevance is not minimized by the loud silence the Court's present opinions accord it. Since "intergovernmental submission to taxation is primarily a problem of finance and legislation," 347 U. S., at 122, it is immaterial that contracts by the Government have been purposefully drawn so as to vest title to the property that is the subject of the tax in the Government, and thereby withdraw it from the taxing power of the States.

If a legal decision were a vehicle for the expression of merely personal views, I might take satisfaction as a dissenter on the facts from the *Allegheny* decision that those who concurred in the result now for all practical purposes repudiate it. The principle on which the decision rested, that a tax cannot be laid on the property of the Federal Government, was not, as the opinion stated, questioned in that case. 322 U. S., at 177. The division turned on a relevant construction of the Pennsylvania taxing system in respect to fixtures in their enhancement of

concededly taxable realty owned by a government contractor. The Court found that the Pennsylvania scheme of taxation was in fact "the old and widely used ad valorem general property tax." 322 U. S., at 184. As we are told by the Court in the present case, "Reviewing all the circumstances the Court [in *Allegheny*] concluded that the tax was simply and forthrightly imposed on the property itself, not on the privilege of using or possessing it." But this is so, *a fortiori*, in the circumstances of Nos. 18 and 36 now before us. Surely the detailed analysis of my brother WHITTAKER of "the terms of the contract and the rights and obligations of the parties under it," in relation to the taxing system of Michigan, demonstrates, if anything is demonstrable in the law, that the tax imposed has all the incidents of a general ad valorem property tax, and that it has them to a more conclusive degree than was true of the tax levied by Pennsylvania in the *Allegheny* case.

### *ALLEGHENY.* *NOS. 18 & 36.*

#### *The Contract.*

| *ALLEGHENY.* | *NOS. 18 & 36.* |
| --- | --- |
| Contract to manufacture ordnance. Machinery needed to produce ordnance to be furnished by Government, or to be manufactured or purchased by contractor. | Subcontract to manufacture airplane parts, subassemblies and nondurable tools (supplies). |
| Title to machinery furnished by Government to remain in Government; title to machinery manufactured or purchased by contractor to vest in Government upon delivery to site of work and inspection and acceptance on behalf of Government. | Title to parts, materials, inventories, work in process, and nondurable tools (materials) to vest in Government upon making of partial payments on such materials to contractor. |
| Machinery to be leased to contractor during period of contract. | |
| Machinery bolted to concrete foundations in contractor's plant. | Materials segregated and identified as Government property, and records kept when withdrawn for use in producing supplies. |

*Action of Taxing Authority.*

Revised contractor's previously determined assessment for ad valorem taxes by adding thereto the value of the machinery.

Assessment of contractor's personal property made including amount for materials acquired for performance of contract.

*Authorization.*

Statute provided: "The following subjects and property shall . . . be valued and assessed and subject to taxation . . . (a) All real estate . . . ." 347 Pa. 191, 193, 32 A. 2d 236, 237–238. State Supreme Court held that machinery constituted part of the mill for purposes of assessment and was properly assessed as real estate.

Statute entitled "General Property Tax Act," "AN ACT to provide for the assessment of property and the levy and collection of taxes thereon . . . . That all property, real and personal, within the jurisdiction of this state . . . shall be subject to taxation." 6 Mich. Stat. Ann., 1950, §§ 7.1–7.2.

City Charter provided: "City Treasurer shall enforce the collection of all unpaid taxes which are assessed against the property or value other than real estate." Charter of the City of Detroit, Tit. VI, c. IV, § 26.

State Supreme Court found that the tax was assessed not against the Government but against the contractor.

Statute provided that taxes assessed "shall become at once a debt due . . . from the persons to whom they are assessed . . . ." 6 Mich. Stat. Ann., 1950, § 7.81.

City Charter provided that, "The owners or persons in possession of any personal property shall pay all taxes assessed thereon," that all city taxes upon personal property "shall become a debt against the owner from the time of the listing of the property for assessment . . . ," and that if the taxes remain unpaid, "the City Treasurer shall forthwith levy upon . . . the personal property of any person refusing or neglecting to pay such tax . . . ." Tit. VI, c. IV, §§ 1, 27, 26.

Statute provided: taxes are "declared to be a first lien on said property." 322 U. S. 174, 185.

Statute provided: "all personal taxes hereafter levied or assessed shall also be a first lien . . . on all personal property of such persons so assessed . . . . The personal property taxes hereafter levied or assessed by any city or village shall be a first lien . . . upon the personal property assessed . . . ." 6 Mich. Stat. Ann., 1950, § 7.81.

City Charter provided that all city taxes "shall become a lien on the property taxed . . . ," and that "All city taxes upon personal property shall become . . . a lien thereon and so remain until paid . . . ." Tit. VI, c. IV, §§ 1, 26.

State Supreme Court found that even if contractor defaulted in payment of tax, the rights of the Government in the machinery could not in any way be affected.

Assessor inscribed on tax roll: "Assessed Subject to Prior Rights of Federal Government."

I cannot believe that the Court would outright reject the doctrine of constitutional immunity from taxation of the Government and its property. I cannot believe that the Court is prepared frankly to jettison what has been part of our constitutional system for almost 150 years. But it does not save the principle to disregard it in practice. And it disregards it in practice to argue from the right of a State to levy an excise tax against a contractor for the enjoyment of property that gives him an economic advantage because it is otherwise immune from taxation, to the right of a State professedly and directly to lay an ad valorem property tax on what is indubitably government property. ⋆ ⋆ ⋆

A totally different problem is presented by Nos. 26, 37, and 38. These cases present the question whether enjoyment of the use of property that carries special economic

advantages to the user because, for one reason or another, the property as such cannot be the subject of a tax, is included within Chief Justice Marshall's principle that "all subjects over which the sovereign power of a state extends, are objects of taxation . . . ." *Weston* v. *City Council of Charleston,* 2 Pet. 449, 467. If a State may impose an excise tax on something that gives advantage or pleasure, such as the practice of a particular profession, why is it not also a taxable advantage that is had from being able to use property that for reasons extraneous to the user is not subject to the taxing power? Cf. *Watson* v. *State Comptroller,* 254 U. S. 122.

The only right that a taxpayer can assert against the state taxing power on the basis of governmental immunity is a "derivative one," *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 158, *supra,* and if he is to resist the exercise of this power he must stand in the Government's shoes. The immunity that he asserts is the Government's immunity, not his own. In taxing the enjoyment or use of property that is itself free from taxation, the State taxes an interest of the taxpayer, not of the Federal Government, and the tax is not laid on "the Government, its property or officers." The taxpayer is not immune from a tax because as a matter of dollars and cents it may affect the Government. To be sure, the excise in Nos. 26, 37, and 38 is measured by the value of the property, so that if the property were directly taxed the tax bill would be the same. But if the enjoyment of otherwise tax-free property is something different from the property itself for purposes of taxation, it does not lose this characteristic because the admeasurement is the same.

A principle with the uninterrupted historic longevity attributable to the immunity of government property from state taxation has a momentum of authority that reflects, if not a detailed exposition of considerations of policy demanded by our federal system, certainly a deep

instinct that there are such considerations, and that the distinction between a tax on government property and a tax on a third person for the privilege of using such property is not an "empty formalism." The distinction embodies a considered judgment as to the minimum safeguard necessary for the National Government to carry on its essential functions without hindrance from the exercise of power by another sovereign within the same territory. That in a particular case there may in fact be no conflict in the exercise of the two governmental powers is not to the point. It is in avoiding the potentialities of friction and furthering the smooth operation of complicated governmental machinery that the constitutional doctrine of immunity finds its explanation and justification.

The danger of hindrance of the Federal Government in the use of its property, resulting in erosion of the fundamental command of the Supremacy Clause, is at its greatest when the State may, through regulation or taxation, move directly against the activities of the Government. Scarcely less is the danger when the subject of a tax, that at which the State has consciously and purposefully aimed in attaching the consequence of taxability, is the property of the Federal Government. It is not only that the likelihood of local legislation deliberately or unwittingly discriminatory against government property either by its terms or application may be enhanced. Even a nondiscriminatory tax, if it is expressly laid on government property, is more likely to result in interference with the effective use of that property, whether because of an ill-advised attempt by the tax collector to levy on the property itself or because it is sought to hold the Government or its officers to account for the tax, even if ultimately the endeavor may fail. The defense of sovereign immunity to a suit against government officers for the tax, or a suit to assert title to

or recover property erroneously levied upon to satisfy a tax, may in practice be an inadequate substitute for the clear assertion of federal interest at the threshold.

The fact that a tax on a third party for the privilege of using government property may itself have an indirect impeding effect is no reason against a rule designed to avoid the more direct and obvious evil. Because a constitutional doctrine is not pushed to the logical extremities of its policy is no argument against maintaining it as far as it has historically extended. From the beginning a broad cloak of immunity for government property has been thought the best way to allay the danger of state encroachment on the national interest, and the character of our federal system and the relations between the Nation and the States have not in this regard so changed that the principle has become outmoded.

If the distinctions between the taxes involved in these cases seem nice, it is because "nice distinctions are to be expected," *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 U. S. 217, 225, and they are none the worse for it. Not to make them, to lump all these cases together as though some similarities and assumed similar consequences amount to identities, is to disregard a long, unbroken course of judicial history and practicalities of government that doubtless have led, under prior decisions of this Court, to the drawing of countless contracts covering the use of government property.

Accordingly, I dissent from the Court's opinion in Nos. 18 and 36, and concur in the result in Nos. 26, 37, and 38.

Opinion of MR. JUSTICE HARLAN.*

Because all but two members of the Court consider that the taxes involved in these cases all stand or fall

---

*[NOTE: This opinion applies also to No. 26, *United States* v. *City of Detroit, ante,* p. 466, and No. 37, *United States* v. *Township of Muskegon, ante,* p. 484.]

together, I deem it advisable to state my reasons for believing that these cases require different conclusions as to the constitutionality of the taxes involved.

In determining the constitutionality of a state tax against a claim of federal immunity, past cases in this Court have established a distinction between "property" and "privilege" taxes of one kind or another. That is, broadly speaking, a State may not constitutionally tax property owned by the Federal Government, even though the property is in private hands and the tax is to be collected from a private taxpayer, *United States* v. *Allegheny County,* 322 U. S. 174, but it may tax activities of private persons, even though these activities involve the use of government property and the value or amount of such property becomes the partial or exclusive basis for the measurement of the tax. *Curry* v. *United States,* 314 U. S. 14; *Esso Standard Oil Co.* v. *Evans,* 345 U. S. 495. Cf. *Plummer* v. *Coler,* 178 U. S. 115; *Educational Films Corp.* v. *Ward,* 282 U. S. 379. Although the opinions of the Court in the present cases stop short of repudiating this established distinction, they seem to me to blur it to the point where the extent of its future application is left confused and uncertain.

In view of this Court's past decisions in the privilege-tax cases, I agree with the majority today that the lessee's and user's tax in Nos. 26, 37 and 38, construed by the state court to be a tax on the privilege of using tax-exempt property, is constitutional as applied. The dissenting opinion, which I do not believe can be reconciled with these past decisions, concludes that the tax imposed upon those using tax-exempt property for private profit should be regarded in substance as a tax on the property itself because the privilege tax is measured by the full value of the leased or used property, rather than merely by the value of the lessee's or user's interest.

In effect, it seems to me that the dissenters equate the measure of the tax with the subject of the tax. But I do not think that the formula here employed by Michigan to measure these taxes can be meaningfully distinguished from that applied in the Alabama use tax upheld in *Curry* v. *United States, supra.* There the use tax collected from a government contractor was measured by a percentage of the full value of government-owned property used by the contractor to execute its obligations. Indeed, the only distinction I can see is that the compensating use tax in *Curry* was imposed just once, whereas the privilege tax in Michigan is assessed yearly; but having regard to the wide latitude of a State's taxing power within the due-process limitations of the Fourteenth Amendment, I can hardly believe that this difference points to a contrary constitutional result. The decision in *Esso Standard Oil Co.* v. *Evans, supra,* which upheld a state tax assessed to a private taxpayer on the privilege of storing gasoline although the tax was measured in part by the amount of government gasoline stored multiplied by a fixed rate, provides further support for this conclusion. And in both of those cases, as is true here, the Government bore the full economic burden of the state taxes.

It should be observed that the state taxes here, as those in *Curry* and *Esso Standard Oil Co.,* do not operate in a discriminatory fashion by so measuring the tax on use or activities as to impose an unequal tax burden on lessees or users of government property *vis-à-vis* lessees, users, or owners of other tax-exempt or nonexempt property. And since this is so, I cannot agree with the dissenting opinion that this Court's view of the state legislature's purpose in enacting the statute should affect our determination of its constitutionality. Although Michigan here sought to equalize tax burdens on users of normal and tax-exempt property, or perhaps even to by-pass *Alle-*

*gheny,* I think it hardly repaying to speculate on the motives behind a local tax, as long as it is otherwise constitutionally permissible. Finally, it should be noted that assessment of the privilege tax to the user of government property in Nos. 37 and 38 would present a quite different problem if the user were deemed to be an instrumentality of the United States Government, but petitioners in those cases make no such showing, and I do not understand the dissenters here to rely on such a ground.

In Nos. 18 and 36 the Court holds that a tax which the dissenting opinions convincingly show is nothing but a conventional ad valorem personal property tax should be regarded instead as a tax upon the *possession* of government property privately used. This the Court finds constitutionally indistinguishable from the tax upon the use of government property privately possessed which has been upheld as a privilege tax in Nos. 26, 37, and 38. That is to say, the Court finds that the Government's property here was simply the measure, and not the subject matter, of a tax which was in effect imposed on the privilege of possessing property used for private gain.

In so holding, the Court, proceeding on the premise that Detroit's characterization of this tax as a personal property tax does not bind us, *Carpenter* v. *Shaw,* 280 U. S. 363, 367–368, relies on the circumstances that this government property was used for private gain, that the tax was collectible under the statute from the subcontractor and not from the Government or out of its property, and that the tax was nondiscriminatory. But all of these factors were present in *United States* v. *Allegheny County, supra,* where the Court struck down a local tax also cast in the traditional language of a "property" tax. Although the Court here purports to distinguish *Allegheny,* it seems to me that the authority of that case has now been reduced almost to the vanishing point, for neither the tax statute

here nor that in *Allegheny* qualified application of the tax to property employed in private commercial activity.

What has happened in these two groups of cases no doubt reflects the difficulty of reconciling *Allegheny* with the privilege tax cases, and bears witness to the truth of Mr. Justice Jackson's statement in *Allegheny* that in the evolution of the law in this difficult field "the line between the taxable and the immune has been drawn by an unsteady hand." 322 U. S., at 176. Since the economic incidence of a state tax on the Federal Government is no longer a controlling factor, *James* v. *Dravo Contracting Co.,* 302 U. S. 134; *Alabama* v. *King & Boozer,* 314 U. S. 1, and since the use of federally owned property as the measure, by value or amount, of a tax on the privilege of using (*Curry* v. *United States, supra*) or storing (*Esso Standard Oil Co.* v. *Evans, supra*) such property is permissible, the distinction between "property" and "privilege" taxes as a yardstick for judging constitutionality when both taxes are collectible from a private taxpayer holding the property is certainly left in a high degree of artificiality. See Powell, Intergovernmental Tax Immunities, 58 Harv. L. Rev. 633, 757; cf. *Society for Savings* v. *Bowers,* 349 U. S. 143, 148. This is certainly so where the property tax applies to property used by a private party in some activity which is a proper subject of state taxation, see *M'Culloch* v. *Maryland,* 4 Wheat. 316, 429, and where, as here, the State does not seek to accomplish what would in any event be procedurally impossible because of the doctrine of sovereign immunity from suit—enforcement of a lien asserted against government property. It is quite understandable, therefore, that the Court should wish to minimize the importance of that distinction.

But by holding that the ad valorem personal property taxes involved in Nos. 18 and 36 should be regarded as

"privilege" taxes, it seems to me that the Court has injected further uncertainties into a field already plagued by excessive refinements. For until today the line between property and privilege taxes, if "drawn by an unsteady hand," was at least visible. A State could not tax government property, even though the property was in the hands of, and the tax was collectible only from, private persons. However, it now appears that not all property taxes are indeed "property" taxes for purposes of constitutional immunity, even though so characterized or construed by state authorities. Henceforth, apparently, we must determine whether the tax which a State has drafted as and denominated a "property" tax could, had the State so desired, have been constitutionally imposed as a "privilege" tax, measured by the value of the taxed property, upon some activity embracing the use of the property.

In my opinion, so fluid a rule incorporating these elusive additional distinctions will hardly help those who in their daily business must negotiate contracts for or with the Government. Indeed, the difficulty of its application is effectively illustrated by the divergence of opinion in these very cases, wherein five members of the Court have concluded that these particular "property" taxes are in reality "privilege" taxes. Rather than add further complications to an already troubled area of the law, I think the preferable course is to follow our past cases, upon which those contracting for the Government have undoubtedly relied, and to leave to Congress the task of adjusting to the needs of today the law which *Allegheny* and the privilege tax cases have created.

For these reasons, I have joined the opinion of the Court in Nos. 26, 37 and 38, and the dissenting opinion of MR. JUSTICE WHITTAKER in Nos. 18 and 36.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE BURTON and MR. JUSTICE HARLAN join, dissenting.

I respectfully dissent. The bases of my disagreement can be made clear only by a full treatment of the case.

On December 20, 1950, the United States entered into a contract with Kaiser Manufacturing Company under which the latter agreed to produce and deliver to the Air Force certain airplanes, airplane parts and subassemblies, at fixed prices; and on December 12, 1950, a similar contract was made by the Government with Curtiss-Wright Corporation. As contemplated by the parties, Kaiser, on March 23, 1951, and Curtiss-Wright, on April 19, 1951, entered into subcontracts with respondent, The Murray Corporation of America, under which the latter agreed to produce and deliver to those prime contractors certain airplane parts, subassemblies and nondurable tools (hereinafter called *supplies*) at fixed prices, which subcontracts were approved by the contracting officer of the Air Force. The subcontracts contained "partial payment" provisions which provided, among other things, that upon the making of any partial payments to Murray under the subcontracts "title to all parts, materials, inventories, work in process and non-durable tools theretofore [and thereafter, upon acquisition] acquired or produced by the [sub]contractor for the performance of [the] contract[s], and properly chargeable thereto . . . shall forthwith vest in the Government." Such property will hereinafter be called *materials*. After the date of the subcontracts, and prior to January 1, 1952, the Government, through the prime contractors, made "partial payments" to Murray in the amount of $674,776.87.[1] None of the supplies to

---

[1] In the period beginning August 10 and ending December 31, 1951, partial payments were made to Murray, by the Government, under

be produced by respondent under the subcontracts had been completed or delivered prior to January 1, 1952.

On the 1952 tax assessment date of January 1, 1952, petitioners, the City of Detroit and the County of Wayne, made an assessment (valuation) of Murray's personal property in the amount of $12,183,180, which included $2,043,670 for materials originally acquired by Murray for the performance of the subcontracts, and properly chargeable thereto. Applying their respective tax rates to that assessment, the City of Detroit imposed a tax of $67,714.96 and the County of Wayne imposed a tax of $12,572.66, more than would have been the case if the value of the materials of $2,043,670 had not been included in the 1952 assessment against Murray.

Murray paid those taxes under written protest,[2] and after having exhausted all administrative remedies, it brought three actions against petitioners in the United States District Court for the Eastern District of Michigan for refund of that part thereof ($80,287.62 plus interest) allocable to inclusion in the assessment of the $2,043,670 upon the materials referred to.[3] The United

---

the Kaiser prime contract in the total amount of $163,949.20, and under the Curtiss-Wright contract in the total amount of $510,827.67, aggregating $674,776.87, and on the latter date requests for further partial payments in the amount of $569,211.09 were outstanding and being processed.

[2] It there contended that materials of the value of $2,043,670, included in the assessment against it and its personal property, were owned by the Federal Government and were therefore constitutionally immune from state taxation, and that the additional tax assessed on account thereof of $80,287.62 was void.

[3] It appears that Detroit personal property taxes are payable in two installments. The first two suits (Nos. 12108 and 12482) were brought against the City of Detroit for refund of the first and second halves, respectively, of the taxes so paid under protest. The third suit (No. 12483) was brought against the County of Wayne for refund of the taxes so paid to it under protest.

States intervened in the actions and, by stipulation, they were consolidated for trial. Murray moved for summary judgments, and the parties stipulated that no genuine issue of material fact existed in the actions. The court, after considering the motion, and the exhibits and affidavits in support of and in opposition thereto, and hearing the arguments and considering the briefs of counsel, granted the motion and rendered judgment in each of the actions in favor of Murray and against petitioners for the amount prayed, plus interest. 132 F. Supp. 899. The Court of Appeals, holding that the materials were owned by the Government, and not by Murray, on the assessment date, that the tax assessed and imposed thereon and collected by petitioners was a general ad valorem personal property tax on the Government's property, and that the Government was constitutionally immune from such taxes, affirmed the judgments of the District Court. 234 F. 2d 380.

The majority now reverses the Court of Appeals and reinstates the assessment and tax. In doing so, I believe, they are not only in serious error, but also they add words to the taxing Acts involved and the opinion openly so admits. See p. 493, *supra*.

Three principal issues are presented, namely: (1) Did the Government, by the terms of the "partial payment" provisions of the subcontracts, become "vest[ed]" with "title" to all elements of property and incidents of ownership in the materials referred to prior to the assessment date, or did it thereby acquire "title" thereto only as security and, thus, become only a lienor? (2) Is this a general ad valorem tax imposed *on* the materials, as contended by respondents and as found by the Court of Appeals? (3) If the materials were, in fact, the property of the Government on the assessment date, and the tax constitutes a general ad valorem tax *on* that property, may the tax be constitutionally imposed?

## I.

The first question of whether the Government acquired complete and absolute title to the materials prior to, and beneficially owned them on, the assessment date, as respondents contend, or had acquired "title" thereto only as security and was therefore only a lienor, as contended by petitioners, depends upon the terms of the "partial payment" provisions of the subcontracts and upon actual operations thereunder, for the question, in last analysis, is one of intention of the contracting parties.

The partial payment provisions, in pertinent part, provide:

"11. *Partial payments.*—Partial payments . . . may be made upon the following terms and conditions.

"(a) The contracting officer may, from time to time, authorize partial payments to The Murray Corporation of America (hereinafter called 'the Contractor') upon property acquired or produced by it for the performance of this contract: *Provided,* that such partial payments shall not exceed 90 percent of the cost to the Contractor of the property upon which payment is made [and] in no event shall the total of unliquidated partial payments (see (c) below) . . . made under this contract, exceed 80 percent of the contract price of supplies still to be delivered.

"(b) Upon the making of any partial payment under this contract, *title* to all parts, materials, inventories, work in process and non-durable tools theretofore [and thereafter, upon acquisition] acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto . . . *shall forthwith vest in the Government* . . . .

"(c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained.

"(d) It is recognized that [the materials], *title to which is or may hereafter become vested in the Government pursuant to this Article* will from time to time be used by . . . the Contractor in connection with the performance of this contract. The Contractor, either before or after receipt of notice of termination [by the Government], *may acquire or dispose of property to which title is vested in the Government* under this Article, upon terms approved by the Contracting Officer . . . . The agreed price (in case of acquisition by the contractor) or the proceeds received by the Contractor (in case of any other disposition), shall, to the extent that such price and proceeds do not exceed the unliquidated balance of partial payments hereunder, be paid or credited to the Government as the Contracting Officer shall direct; and such unliquidated balance shall be reduced accordingly. Current production scrap may be sold by the Contractor without approval of the Contracting Officer but the proceeds will be [paid or credited to the Government] . . . . Upon liquidation of all partial payments hereunder or upon completion of deliveries called for by this contract, *title to all* property (or the proceeds thereof) which has not been delivered to and accepted by the Government under this contract or which has not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this Article *shall vest in the Contractor.*

"(e) . . . The provisions of this Article shall not relieve the Contractor from risk of loss or destruction of or damage to property to which title vests in the Government under the provisions hereof." (Emphasis supplied.)

It was shown, by an uncontradicted affidavit, at the hearing on the motion for summary judgments that the materials originally acquired by Murray for performance of the subcontracts, and properly chargeable thereto, were completely segregated from all other personal property in its plant and were "clearly identified," by "tagging [or] labeling," as property of the Government; that as materials were withdrawn by Murray, for use in producing the supplies, complete records of the materials so withdrawn, and the Government's costs therefor, were made and kept; and that when the supplies were completed and delivered by Murray and accepted by the Government, Murray paid the Government for the materials so consumed by crediting the contract price for the supplies with an amount equal to the Government's cost (90 percent of Murray's original cost) for the materials consumed in producing the supplies, as provided in subparagraph (c) of the partial payment provisions.

As noted, *supra,* subparagraph (b) of the partial payment provisions of the subcontracts expressly provides that, upon the making of any partial payment to Murray under the subcontracts, *"title"* to the materials *"shall forthwith vest in the Government."* Beginning on August 10, 1951, partial payments were made from time to time by the Government to Murray in very substantial amounts (see note 1). It cannot be doubted that the plain and simple language of subparagraph (b) was appropriate, apt and adequate to vest the *title* to the

materials in the Government.[4] Petitioners concede, and the majority assumes, that this is so. Petitioners' position is, however, that the title so vested in the Govern-

---

[4] Petitioners, however, contend that the partial payment provisions of the subcontracts are invalid as beyond the power of the Government to make. They rely principally upon the provisions of the Armed Services Procurement Act of 1947, c. 65, 62 Stat. 21, and particularly upon the language in § 5 (a) and (b) thereof saying, in pertinent part:

"(a) The agency head may make *advance payments* under negotiated contracts . . . in any amount not exceeding the contract price . . . *Provided,* That advance payments shall be made only upon *adequate security* . . . . (b) The terms governing *advance payments* may include *as security* provision for, and upon inclusion of such provision there shall thereby be created, a lien in favor of the Government, paramount to all other liens, upon . . . such of the material and other property acquired for performance of the contract as the parties shall agree." (Emphasis supplied.)

They therefore argue that the Government is not empowered to enter into contracts to make "partial payments" for the purchase of materials as was done here. This argument fails to recognize the long-existing and well-established distinction between "advance payments" dealt with in § 5 and "partial payments." At the time the Act was passed the terms "advance payments" and "partial payments" had long since become terms of art in government procurement laws and regulations. (See Joint Resolution No. 24, May 5, 1894, 28 Stat. 582; Act of August 22, 1911, c. 42, 37 Stat. 32; Act of October 6, 1917, c. 79, § 5, 40 Stat. 345, 383; Act of June 28, 1940, c. 440, 54 Stat. 676; Act of July 2, 1940, c. 508, 54 Stat. 712; First War Powers Act, 1941, c. 593, 55 Stat. 838, § 201; Executive Order 9001 (December 27, 1941), 6 Fed. Reg. 6787; War Department Procurement Regulations (July 1, 1942), §§ 81.321, 81.331, 81.347, 81.348, 7 Fed. Reg. 6098, 6105, 6108, 6112, 6113; War Department Procurement Regulations (August 25, 1945), §§ 803.321, 803.330, 803.331, 10 Fed. Reg. 10449, 10501–10503, 10507–10508; Army Procurement Regulations (November 18, 1947) §§ 804.400–804.407, 805.405, 805.407–2 (a) (b), 12 Fed. Reg. 7692–7693, 7700–7705.) The two terms are not synonymous. It has long been recognized and understood that an "advance payment" is a loan by the Government and can be made "only upon adequate security" as provided in § 5 of the

ment was for security purposes, and created only a lien on the materials as security to the Government, and also that actual operations under the contracts were incon-

Armed Services Procurement Act, but "partial payments" are payments made by the Government in purchase of materials and are authorized when ownership thereto vests in the Government. Army Procurement Regulations (November 18, 1947), §§ 804.400–7, 805.405, 805.407–2 (a) (b), 12 Fed. Reg. 7692–7693, 7700, 7704–7705. The distinction is made clear in Armed Services Procurement Regulations of November 23, 1950 (32 CFR (1949 ed.) § 402.501), saying:

"Advance payments shall be deemed to be payments made by the Government to a contractor in the form of loans or advances prior to and in anticipation of complete performance under a contract. *Advance payments are to be distinguished from 'partial payments' and 'progress payments' and other payments made because of performance or part performance of a contract.*" (Emphasis supplied.)

The bill which became the Armed Services Procurement Act of 1947 was introduced at a time when there were existing War Department Procurement Regulations describing and making provisions for both "advance payments" and "partial payments." The latter provisions required that title to all materials acquired by the contractor for performance of the contract should vest in the Government on the making of such "partial payments." War Department Procurement Regulations, August 25, 1945, §§ 803.330–803.331, 10 Fed. Reg. 10507–10508. Against this historical background the terms of § 5 of the Armed Services Procurement Act of 1947 cannot be construed to prohibit the making of "partial payments" by the Government to a contractor in respect to materials procured for performance of a government contract when title to those materials, by the terms of the contract, vests in the Government. These were negotiated contracts made in pursuance of § 2, c. 65, of the Armed Services Procurement Act of 1947 (62 Stat. 21), and being such, Congress, by § 4 of that Act, has expressly granted wide discretion to the agency head in determining the type of contract which will promote the best interests of the Government. There being no prohibition against the use in government contracts of partial payment provisions made in purchase of materials, contracting officers are free to follow business practices. *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, 116. Thus, there is no merit in petitioners' claim that the Government was not empowered to agree to the partial payment provisions in these contracts.

sistent with any real intention to convey actual ownership of the materials to the Government.

As to petitioners' "lien" contention, we must ask ourselves: A lien as security for what? Admittedly Murray was not indebted, nor to become indebted, to the Government under the subcontracts and, hence, there was and would be no debt to secure. Nor can it be said that the vesting of title to the materials in the Government was in any way to secure repayment of the partial payments made by the Government to Murray, because those partial payments were not to be repaid to the Government, but were expressly made by the Government in payment of the purchase price for the materials. Neither can it be said that the vesting of title to the materials in the Government was for the purpose of securing performance of the contracts by Murray, as conveyance of the materials to the Government could not possibly have any such legal effect.

Petitioners advance several arguments in support of their claim that the terms of the subcontracts, and actual operations under them, were inconsistent with any real intention to convey actual ownership of the materials to the Government.

As to the terms of the subcontracts, they argue, first, that subparagraph (d) of the partial payment provisions, saying that "[c]urrent production scrap may be sold by the Contractor without approval of the Contracting Officer," supports their contention. That argument overlooks the fact that the subparagraph continues, saying, "but the proceeds will be [paid or credited to the Government]." Thus, the contractor is authorized merely to sell the current production scrap as agent for the Government and must account to it for the proceeds, and, hence, this procedure is in no way inconsistent with the Government's ownership of the scrap. Second, they argue that the language of subparagraph (d) saying that, "[u]pon

liquidation of all partial payments hereunder or upon completion of deliveries called for by this contract, title to all property (or the proceeds thereof) which has not been delivered to and accepted by the Government under this contract or which has not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this Article *shall vest in the Contractor,*" shows that the Government's title to the materials was not real and beneficial. (Emphasis supplied.) This argument cannot be accepted, for if, as was plainly true, the language of subparagraph (b) saying that, upon the making of partial payments by the Government to Murray, title to the materials "shall forthwith vest in the Government" was adequate to effect a transfer by Murray to the Government, it must follow that the similar language in subparagraph (d) was adequate to effect a retransfer, upon full completion of the subcontracts, of any remnant of the materials by the Government to Murray; nor can it be denied that the Government had the right and power validly to retransfer that property under those circumstances.

Concerning operations under the subcontracts, petitioners argue, first, that the use of the partial payment provisions in the subcontracts was a legal device for the purpose of escaping state ad valorem personal property taxation. This argument is not only unacceptable on its merits (cf. *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, 116, 122 [5]), but, in addition, it is contrary to the stipula-

---

[5] A similar contention was made in that case, and in rejecting it this Court said: "[W]e turn to examine the validity of the argument that the naming of the Government as purchaser was only colorable and left the contractor the real purchaser and the transaction subject to the Arkansas tax. *Alabama* v. *King & Boozer,* 314 U. S. 1, is relied upon primarily. We consider this argument under the assumption, made by the Supreme Court of Arkansas,

tion made by the parties at the hearing in the District Court.[6] Second, they argue that the fact that Murray insured the materials and its admittedly owned property in one policy in its own favor is inconsistent with government ownership of the materials and indicates that Murray regarded these materials as owned by it. As noted, *supra,* Murray agreed, under the terms of the contracts, to be liable to the Government for loss or destruction of or damage to the materials, occurring while in its possession, "to which title [had] vest[ed] in the Government under the provisions [of the subcontracts]." To insure that contractual liability Murray caused its insurance policy to be expanded to cover, *inter alia,* ". . . personal property . . . sold but not delivered or removed, or for which [it is] liable, all while located in and/or on the premises occupied by the insured."[7] Plainly, this precautionary action by Murray was in no way inconsistent with outright government ownership of the

that the contract was designed to avoid the necessity in this cost-plus contract of the ultimate payment of a state tax by the United States. . . . We find that the purchaser under this contract was the United States. . . . [We do not] think that the drafting of the contract by the Navy Department to conserve Government funds, if that was the purpose, changes the character of the transaction." 347 U. S., at 116, 122.

[6] It was stipulated that in the negotiation of the subcontracts the "parties did not consider the possible avoidance of City and County ad valorem and personal property taxes as an element in their decision as to whether or not the standard partial payment clause (referred to in procurement regulations) should be inserted in these contracts."

[7] That insurance coverage provision reads as follows: "All real and personal property of the insured, including manuscripts, mechanical drawings, tools, dies, jigs and patterns, their own, or held by them in trust or on commission, or on consignment, or sold but not delivered or removed, or for which they are liable, all while located in and/or on the premises occupied by the insured."

materials, but, on the contrary, it strongly indicates Murray's intention and understanding that the materials had been sold to and were owned by the Government though not delivered. Cf. *United States* v. *Ansonia Brass & Copper Co.*, 218 U. S. 452, 467.

In *United States* v. *Ansonia Brass & Copper Co., supra,* this Court dealt at length with like contentions. There the Government had entered into a contract for the construction and delivery of a seagoing dredge to be named the *Benyuard.* The contract provided that the Government was to make 10 equal partial payments to the contractor, to aggregate 80 percent of the contract price, the first to be made when the hull and propelling machinery should be 10 percent complete, the second when 20 percent complete, and so on to the last payment, which was to be made when the vessel was delivered to and accepted by the Government, when the reserved 20 percent of the contract price was to be paid; and that "[t]he parts paid for under the system of partial payments above specified [were to] become thereby the sole property of the United States." *Id.,* at 466. Before completion of the dredge the contractor became insolvent and was unable to pay bills for materials used in the vessel, and a receiver was appointed. An issue arose as to whether the provisions of the contract had conveyed ownership of the unfinished vessel to the Government, thus preventing levy thereon of materialmen's liens created under state law. The Government contended ". . . that the terms of this contract [were] such that by its expressed provisions the vessel was to become the property of the United States as fast as it was paid for." *Ibid.* Upon that issue this Court said:

"It is undoubtedly true that the mere facts that the vessel is to be paid for in installments as the work progresses, and to be built under the superintendence

of a government inspector, who had power to reject or approve the materials, will not of themselves work the transfer of the title of a vessel to be constructed, in advance of its completion. But it is equally well settled that if the contract is such as to clearly express the intention of the parties that the builders shall sell and the purchasers shall buy the ship before its completion, and at the different stages of its progress, and this purpose is expressed in the words of the contract, it is binding and effectual in law to pass the title. . . .

. . . . .

"As we construe the contract for the construction of the Benyuard, it did 'divest the builder of any title to the property in the vessel during the process of construction.' . . .

. . . . .

". . . We are not now dealing with the right of a State to provide for such liens while property to the chattel in process of construction remains in the builder, who may be constructing the same with a view to transferring title therein to the United States upon its acceptance under a contract with the Government. We are now treating of property which the United States owns. . . . The Benyuard, as fast as constructed, became one of the instrumentalities of the Government . . . ." *Id.,* at 466, 470, 471.

This Court thus held that the contract—containing title-vesting provisions almost identical with the ones here—conveyed full ownership of the unfinished vessel—not a mere lien—to the Government, and it, therefore, reversed the judgment of the court below which had allowed state-created materialmen's liens to be imposed upon the unfinished vessel. The principles of that deci-

sion appear to have been followed in every decided case in this country upon the question [8] save one.[9]

I believe that these considerations require the conclusion that the District Court and the Court of Appeals were right in holding that the contracts in question conveyed full beneficial title—all elements of property and incidents of ownership—in the materials to the Government.

## II.

Is this a general ad valorem tax imposed *on the materials?* The majority holds, we think erroneously, that it is not. Under the Constitution of the State of Michigan [10] only two general methods of taxation by the State or its subdivisions are authorized, namely, (1) ad valorem taxes, and (2) excise or privilege taxes. *C. F. Smith Co.* v. *Fitzgerald,* 270 Mich. 659, 672, 259 N. W. 352, 357; *Pingree* v. *Auditor General,* 120 Mich. 95, 102, 109, 78 N. W. 1025, 1027, 1029–1030. The taxes here questioned were levied both by the city and county subject to the authority of the General Property Tax Act of Michigan. Act 206 of the Public Acts of Michigan, 1893, as amended (6 Mich. Stat. Ann., 1950, §§ 7.1–7.243) ("[a]n act to provide for the assessment of property and the levy and collection of

---

[8] *In re Read-York, Inc.,* 152 F. 2d 313, 316, 317; *Douglas Aircraft Co.* v. *Byram,* 57 Cal. App. 2d 311, 134 P. 2d 15; *Craig* v. *Ingalls Shipbuilding Corp.,* 192 Miss. 254, 5 So. 2d 676; *State ex rel. Superior Shipbuilding Co.* v. *Beckley,* 175 Wis. 272, 185 N. W. 199; and cf. *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, 116–122; *United States* v. *Allegheny County,* 322 U. S. 174, 178, 183; *In re American Boiler Works,* 220 F. 2d 319, 321, and *Wright Aeronautical Corp.* v. *Glander Corp.,* 151 Ohio St. 29, 84 N. E. 2d 483.

[9] The one exception is *American Motors Corp.* v. *City of Kenosha,* 274 Wis. 315, 80 N. W. 2d 363, but even that case fails to mention that court's earlier decision to the contrary in *State ex rel. Superior Shipbuilding Co.* v. *Beckley, supra.*

[10] Mich. Const., Art. X, § 3.

taxes thereon . . . ."). Section 211.40 of Mich. Comp. Laws, 1948 (6 Mich. Stat. Ann., 1950, § 7.81) provides in pertinent part: "property taxes; lien, priority. [§ 40.] The taxes thus assessed shall become at once a debt due to the . . . city . . . and county from the persons to whom they are assessed . . . . And all personal taxes here- after levied or assessed *shall also be a first lien . . . on all personal property of such persons so assessed . . .* and so remain until paid, which said tax liens shall take prece- dence over all other claims, encumbrances and liens upon said personal property whatsoever . . . ." (Emphasis supplied.)

The pertinent parts of the Charter of the City of Detroit, under which that city acted, are set forth in the margin.[11] Briefly summarized, they provide that "[a]ll

---

[11] Tit. VI, c. II, § 1. "All real and personal property within the city subject to taxation by the laws of this state shall be assessed at its true cash value . . . ."

The following sections appear in Tit. VI, c. IV:

"Section 1. All city taxes shall be due and payable on the fifteenth day of July in each year, and on that date *shall become a lien on the property taxed* . . . [and] the owners or persons in possession of any personal property shall pay all taxes assessed thereon."

"Sec. 7. In case any person by agreement or otherwise ought to pay such tax, or any part thereof, the person in possession who shall pay the same may recover the amount from the person who ought to have paid the same, in an action of *assumpsit* as for moneys paid out and expended for his benefit, or may deduct the amount from any rent due or to become due to the person who should have paid such tax."

"Sec. 26. On and after the twenty-sixth day of August in each year . . . the City Treasurer shall enforce the collection of all unpaid taxes which are assessed *against the property* or value other than real estate. If such taxes shall remain unpaid *the City Treasurer shall forthwith levy upon and sell at public auction the personal property of any person refusing or neglecting to pay such tax,* or collect the same through the courts. . . . All city taxes upon personal property shall become on said fifteenth day of July *a lien thereon and so*

real and personal property within the city, subject to taxation by the laws of Michigan, shall be assessed at its true cash value, and that all city taxes shall be due and payable on the fifteenth day of July in each year, and on that date shall become a lien on the property taxed"; that the "owners or persons in possession" of personal property shall pay the taxes assessed thereon but in case any other person, "by agreement or otherwise," ought to have paid the tax the person in possession who has paid the same "may recover the amount from the person who ought to have paid the same" in an action of *assumpsit,* or may deduct the amount from rents due or to become due; and that if the "taxes which are *assessed against the property*" are not paid by the 26th day of August the City Treasurer "shall forthwith *levy upon and sell at public auction the personal property*"; that the personal property taxes *"in addition to being a lien upon the property assessed* shall become a debt *against the owner* from the time of the listing of the property for assessment, and shall remain a debt *against the owner of the property* or his estate after his death, until the same are paid." (Emphasis supplied.)

We fail to see how it could be more plainly stated that these taxes are ad valorem taxes *on the property.* One cannot profitably elaborate a truth so evident. And the Michigan courts have repeatedly so held. *City of Detroit* v. *Phillip,* 313 Mich. 211, 213, 20 N. W. 2d 868, 869; *Pingree* v. *Auditor General, supra.* Cf. *Crawford* v. *Koch,* 169 Mich. 372, 379, 135 N. W. 339, 342; *In re Ever*

---

*remain until paid,* and no transfer of the personal property assessed shall operate to divest or destroy such lien.

"Sec. 27. All city taxes upon personal property . . . *in addition to being a lien upon the property assessed shall become a debt against the owner* from the time of the listing of the property for assessment, and shall remain a debt *against the owner of the property* or his estate after his death, until the same are paid." (Emphasis supplied.)

*Krisp Food Products Co.,* 307 Mich. 182, 196, 11 N. W. 2d 852, 856. Actually the pleadings formally admit that this is so.[12]

Petitioners stridently argue that the language in § 211.40 of the Michigan Comp. Laws saying that "[t]he taxes thus assessed shall become at once a debt due to the . . . city . . . and county from the persons to whom they are assessed," and the language in §§ 1 and 7 of Tit. VI, c. IV, of the Detroit Charter, saying that "[t]he owners or persons in possession of any personal property shall pay all taxes assessed thereon [and if he] shall pay the same [he] may recover the amount from the person who ought to have paid the same . . . ," shows that the tax is not upon the materials but is, rather, upon the "owners or persons in possession." This argument overlooks the fact that § 211.40 continues, saying that "all personal taxes hereafter levied or assessed *shall also be a first lien . . . on all personal property of such persons so assessed* . . . and so remain until paid." The argument also overlooks the fact that Tit. VI, c. IV, § 1 of the Detroit Charter further provides that "[a]ll city taxes shall be due and payable on the fifteenth day of July in each year, and on that date *shall become a lien on the property taxed,*" as does § 26; and § 27 says "all city taxes upon personal property . . . *in addition to being a lien upon the property assessed* shall become a debt *against the owner* from the time of the listing of the property for

---

[12] Paragraph 3 of the complaint in the first action alleged—and it is stipulated that the complaints in the three cases were the same—that the tax was assessed as "the ad valorem tax on the personal property of this plaintiff for the year 1952 . . . ." The answer of the city "admits the allegations in paragraph three" and the answer of the county "admits . . . that the assessed valuation placed upon the personal property of plaintiff [by the city and adopted by the county was] the ad valorem tax on the personal property of plaintiff for the year 1952."

assessment, and shall remain a debt *against the owner of the property* . . . until the same are paid." See note 11. (Emphasis supplied.) Thus, though the Michigan statute makes the tax a debt of the "owner or person in possession," it also makes the tax "a lien on the property taxed," and the Detroit Charter in addition to making the tax a debt "against the owner" makes it "a lien upon the property assessed." Moreover, the precise question was specifically ruled by this Court in *United States* v. *Allegheny County,* 322 U. S. 174, where it was said:

"While personal liability for the [personal property] tax may be and sometimes is imposed, the power to tax is predicated upon jurisdiction of the property, not upon jurisdiction of the person of the owner, which often is lacking without impairment of the power to tax. In both theory and practice the property is the subject of the tax and stands as security for its payment." *Id.,* at 184. "But in all of these cases [13] what we have denied is immunity for the contractor's own property, profits, or purchases. We have not held either that the Government could be taxed *or its contractors taxed because property of the Government was in their hands." Id.,* at 186. "We think, however, that the Government's property interests are not taxable *either to it or to its bailee." Id.,* at 187. "A State may tax personal property and might well tax it to one in whose possession it was found, but it could hardly tax one of its citizens because of moneys of the United States which were *in his possession* as . . . *agent, or contractor.* We hold that Government-owned property, to the full extent of the Government's interest therein, is

[13] *James* v. *Dravo Contracting Co.,* 302 U. S. 134; *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, and *Alabama* v. *King & Boozer,* 314 U. S. 1.

immune from taxation, either as against the Government itself *or as against one who holds it as a bailee." Id.,* at 188–189. (Emphasis supplied.) .

Petitioners further argue that the Detroit assessor's action in writing on the tax roll, in this instance, the words "assessed subject to prior rights of the Federal Government" shows that the tax is not on the Government's interest, if any, in the materials. It principally relies upon *S. R. A.* v. *Minnesota,* 327 U. S. 558, and *City of New Brunswick* v. *United States,* 276 U. S. 547. While those cases, in an abstract sense, are relevant to the point as urged by petitioners, concretely they are inapposite [14] for in each of those instances the tax was assessed directly upon property beneficially owned by third parties, while here the tax is directly assessed on property beneficially owned by the Government. Moreover, "renunciation of any lien on Government property itself, which could not be sustained in any event, hardly establishes that it is not being taxed. . . ." *United States* v. *Allegheny County, supra,* at 187. Furthermore, inasmuch as the Government in this case beneficially owned the *entire interest* in the materials and the Detroit tax was assessed "subject to" the Government's interest therein, it would seem to follow that the Detroit tax in question was never in fact assessed against anyone.

---

[14] In *S. R. A.* v. *Minnesota,* the Government had sold real estate in Minnesota to S. R. A., Inc., under an installment contract for a deed but had retained legal title only as security and was, in effect, a mortgagee. S. R. A. took possession and improved the land. Afterward the State assessed general ad valorem taxes upon the property "subject to fee title remaining in the United States." S. R. A. claimed exemption from the tax on the ground that title to the property was in the United States. This Court upheld the tax because the contract of sale had transferred to the purchaser the equity in the property upon which alone the tax was levied. *City of New Brunswick* v. *United States* is almost identical to the *S. R. A.* case and varies from it in no substantial respect.

It, therefore, seems inescapable that the tax here involved was an ad valorem tax *on the property* of the Government.

### III.

Since the landmark case of *M'Culloch* v. *Maryland,* 4 Wheat. 316, no legal principle has been more firmly established than that property owned by the Federal Government is constitutionally immune from direct taxation by a State. I agree with the majority that this, of course, does not mean that taxes directly imposed upon third parties—such as agents, contractors or employees— who may be doing business with the Government, share the Government's immunity even though the economic burden of the tax, through higher prices and the like, may ultimately fall upon the Government[15] for such "is but a normal incident of the organization within the same territory of two independent taxing sovereignties." *Alabama* v. *King & Boozer,* 314 U. S. 1, 9. In that case this Court upheld a state sales tax imposed, not directly upon the Government, but, rather, directly upon a government contractor relating to materials purchased by him for use

---

[15] See *Trinityfarm Co.* v. *Grosjean,* 291 U. S. 466, which sustained an excise tax imposed by a State directly upon a government contractor on account of gasoline consumed by him in the performance of a government contract; *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 160, which upheld a gross receipts tax imposed by a State directly upon a government contractor on account of materials purchased by it for its use in performing the contract; *Helvering* v. *Gerhardt,* 304 U. S. 405, which sustained an income tax levied directly upon a construction engineer and two assistant general managers, employees of an agency of the United States, in respect of their salaries from the United States; *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, is precisely like the *Gerhardt* case; *Esso Standard Oil Co.* v. *Evans,* 345 U. S. 495, which upheld a state privilege tax imposed directly by a State upon a storer of gasoline even though, *by contract,* the Government, which had stored its gasoline with the storer, assumed liability for all state taxes.

in the performance of a government contract.[16] The case
of *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, makes
the distinction clear. In that case the government con-
tractor was authorized to and did purchase, *as agent of
and directly for the United States,* certain tractors which
the contractor was permitted to use in the performance of
his "cost-plus-fixed-fee" contract with the Government.
The purchaser was the Government and it paid the vendor
for and took title to the tractors. The state law required
the vendor to collect from the vendee, and remit to the
State, a sales tax on local sales. The vendor, at the
request of the Government, paid the tax on these sales
under protest and sued for refund. The State Supreme
Court sustained the tax. On certiorari this, Court re-
versed, holding that the sale was directly to the Govern-
ment and that the tax was imposed directly upon the
Government which was immune from state taxation.

Under the facts and circumstances here we think the
case of *United States* v. *Allegheny County, supra,* is
entirely controlling. There, Mesta Machine Company
owned a factory in Pennsylvania suitable for the manufac-
ture of ordnance required by the Government. The Gov-
ernment entered into a contract with Mesta under which
the latter undertook to make and deliver guns to the Gov-

---

[16] In its companion case of *Curry* v. *United States,* 314 U. S. 14,
the Court followed the same principle in holding that government
cost-plus contractors who had imported into the State certain mate-
rials which they used in the performance of their contract were
not entitled to share the Government's constitutional immunity from
a state use tax, and said: "If the state law lays the tax upon them
rather than the [Government] with whom they enter into a cost-plus
contract like the present one, then it affects the Government . . . only
as the economic burden is shifted to it *through operation of the con-
tract." Id.,* at 18. (Emphasis supplied.) As in *King & Boozer,*
the impact of the tax upon the Government derived from the Gov-
ernment's voluntary assumption, or, as said by the Court, "through
operation of the contract."

ernment at a fixed price. Mesta lacked some of the necessary machine tools to do the contemplated work. The contract provided that the Government would, and it did, furnish various lathes and other machines, which were "leased" to Mesta and installed in its factory by being "bolted on concrete foundations [and] could be removed without damage to the building." *Id.*, at 179. The contract further provided that if Mesta, after using every effort short of litigation to procure exemption or refund, should be compelled to pay any state, county or municipal tax upon the government-owned machinery, the Government would reimburse Mesta for that amount. Subsequently Allegheny County revised Mesta's previously determined assessment for ad valorem taxes by adding thereto the value of the government-owned machinery and assessed an additional tax on that account. Mesta protested and exhausted administrative remedies without avail and then sued for refund. The United States intervened. The trial court held that the machinery in question "was 'owned by the United States' and so for constitutional reasons could not be included." *Id.*, at 180. The Supreme Court of Pennsylvania reversed, and reinstated the assessment and tax. It acknowledged that the government-owned property was " 'beyond the pale of taxation' by a state" (*ibid.*), but thought that the tax was not against the United States but was assessed against Mesta, as a part of its real estate, and constituted a *debt* of Mesta and a lien on its real estate, but not a debt of the Government nor a lien on its chattels. The case came here on appeal and this Court reversed, saying, *inter alia:*

> "It is not contended that the scheme of taxation employed by Pennsylvania is anything other than the old and widely used *ad valorem* general property

tax. . . . This form of taxation is not regarded primarily as a form of personal taxation but rather as a tax *against the property as a thing.* Its procedures are more nearly analogous to procedures *in rem* than to those *in personam.* While personal liability for the tax may be and sometimes is imposed, the power to tax is predicated upon jurisdiction of the property, not upon jurisdiction of the person of the owner, which often is lacking without impairment of the power to tax. *In both theory and practice the property is the subject of the tax and stands as security for its payment." Id.,* at 184.

"The assessors simply and forthrightly valued Mesta's land as land, and the Government's machines as machinery, and added the latter to the former. We discern little theoretical difference, and no practical difference at all, between what was done and what would be done if the machinery were taxed in form. Its full value was ascertained and added to the base to which the annual rates would apply for county, city, borough, town, township, school, and poor purposes.

"We hold that the substance of this procedure is to lay an *ad valorem* general property tax on property owned by the United States." *Id.,* at 185. (Emphasis supplied.)

The foregoing demonstrates, I think, that the Government owned the materials on the assessment date; that the tax was imposed *on those materials;* that the tax was a general ad valorem tax; and that the Government was constitutionally immune from such taxation by the State.

These are my reasons for dissenting, and, upon them, I would affirm the judgment of the Court of Appeals.