**UNITED STATES of America,**
**Appellant**

v.

**COUNTY OF LAWRENCE, City of New Castle, City of New Castle School District, County of Lawrence Institution District, Appellees.**

**No. 13058.**

United States Court of Appeals
Third Circuit.

Argued March 10, 1960.

Decided July 1, 1960.

Robert S. Griswold, Jr., Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., Hubert L. Teitelbaum, U. S. Atty., Thomas J. Shannon, Asst. U. S. Atty., Pittsburgh, Pa., Roger P. Marquis, Attorney, Department of Justice, Washington, D. C., on the brief), for appellant.

Robert C. Lea, Jr., Philadelphia, Pa. (Norris, Lex, Hart & Ross, Philadelphia, Pa., Orville Brown, New Castle, Pa., Marshall G. Matheny, New Castle, Pa., Howard C. Klebe, New Castle, Pa., on the brief), for appellees.

Before GOODRICH, STALEY and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

This is an appeal from an order of the United States District Court for the Western District of Pennsylvania[1] dismissing the complaint of the appellant, the United States, in which it sought to have declared void certain tax liens for the year 1954 in the aggregate amount of $116,900 imposed by the appellees, County of Lawrence, City of New Castle, City of New Castle School District and County of Lawrence Institution District, governmental bodies and arms of the state government of the Commonwealth of Pennsylvania.

Briefly the pertinent facts which were agreed upon by the parties are as follows:

In 1942, the City of New Castle, in the County of Lawrence, Pennsylvania, conveyed certain parcels of its land to the Defense Plant Corporation, a subsidiary of the Reconstruction Finance Corporation. A defense plant was constructed thereon known as Plancor 765 at a cost of approximately $23,000,000. United Engineering and Foundry Company operated it under a series of leases from 1943 to 1956. The Reconstruction Finance Corporation as successor to the Defense Plant Corporation declared Plancor 765 surplus to its needs under the Surplus Property Act of October 3, 1944,[2] and on September 4, 1947, the War Assets Administration assumed the care, custody and accountability for the property, until it was succeeded by the General Services Administration.[3]

On June 13, 1950, the Reconstruction Finance Corporation conveyed the property to the United States of America by a quit claim deed which was recorded in Lawrence County on December 15, 1953.

On April 25, 1952, the Reconstruction Finance Corporation and the United States, acting through the Administrator of the General Services, as of January 1, 1952, leased Plancor 765 to the United Engineering and Foundry Company for a term of two years ending December 31, 1953. The lessee was required to pay all taxes,[4] assessments and similar charges which were assessed or imposed upon the lessor or the lessee during the term of the lease.[5] Several

---

1. The opinion of the United States District Court is found in 1959, 173 F.Supp. 307.

2. 58 Stat. 765.

3. See Federal Property and Administrative Services Act of 1949, c. 288, 63 Stat. 377, 40 U.S.C.A. § 472 et seq.

4. The district court found that under a series of leases prior thereto the lessee agreed to pay local taxes and did so through December 31, 1953. The leases required a minimum rental with a profit sharing right to the lessor running from 7 to 11.6 percent of net sales.

5. Paragraph 11 of the lease contained the following provisions:
"11. Lessee agrees to pay to the proper authority, when and as the same becomes due and payable, all taxes, assessments and similar charges which at any time during the term of this lease may be taxed, assessed or imposed upon the Lessor or Lessee with respect to or upon the leased premises or any part thereof, or upon the occupier thereof, or upon the use or operation of the leased premises, provided, however, that such taxes, assessments or similar charges shall be prorated and apportioned as of the date of commencement and as of the effective date of expiration, termination or cancellation of this lease, respectively, but the obligation of Lessee with respect to the payment of such taxes, assessments or similar charges shall include the amount thereof properly applicable during the term of this Lease, Lessee also

supplements to the original lease were executed during its term.

On July 13, 1954, the United States and United Engineering and Foundry Company executed an agreement as of January 1, 1954, which renewed the 1951 lease and its supplements, except as modified in the renewal. It provided for a term of one year ending December 31, 1954 and for a month to month tenancy from January 1, 1955 to June 30, 1955. By its terms the lessee was no longer required to pay local taxes but rather was required to pay their equivalent as additional rent.[6]

On August 12, 1955, Congress enacted legislation providing for the payment, in lieu of taxes, to the appropriate taxing authorities, of

> "an amount equal to the amount of the real property tax which would be payable to each such State or local taxing authority on such date if legal title to such real property has been held by a private citizen on such date and during all periods to which such date relates."[7]

Payments for 1955 and 1956 taxes have been made pursuant to the above Act.

The United States had filed a preceding complaint to this suit in the United States District Court for the Western District of Pennsylvania against the same parties as are appellees here under United States v. Hanlon, 165 F.Supp. 1, in which it prayed to have taxes for the years 1954, 1955 and 1956 declared void. That suit was dismissed without prejudice pursuant to an opinion and order filed November 19, 1958.[8]

On July 19, 1956, and while the said suit was pending, the United States conveyed the property to Mesta Machine Company by deed, without warranty, and the purchaser executed a purchase price mortgage to secure its note in the sum of $7,500,000.

---

agrees to contract in its own name for and to pay all claims or charges for or on account of water, light, heat, power and any other service or utility furnished to or with respect to the leased premises or any part thereof.

"In the event Lessee fails to pay, when due, any taxes, assessments, utility bills or similar charges, as above set forth, then Lessor may, at its option, pay such taxes, assessments, bills or other charges and require Lessee to immediately reimburse it for such cost, which amount is hereby declared to be additional rental and shall become immediately due and payable. Lessor reserves the right to contest the validity or amount of any tax or assessment and Lessee agrees to give Lessor notice of all taxes and assessments immediately upon receipt thereof by Lessee."

6. The pertinent provision in the 1953 renewal is contained in Paragraph VI, amending paragraph II, of the 1951 lease and reads as follows:

"11(a). In addition to any and all rentals required by this Lease, as amended, to be paid, Lessee shall pay to Lessor, as additional rent, the sum of $110,008.-41 for the period from January 1, 1954 to December 31, 1954, in quarterly installments of $27,502.11 in advance during the calendar year 1954, and the sum of $9,167.37 in advance for each month or part thereof the Lessee occupies the leased premises hereunder during the period January 1, 1955 to June 30, 1955.

"(b) In the event the leased premises, or any part thereof, during the lease term, becomes taxable for real estate taxes for any reason whatsoever, whether by the enactment of Federal legislation or otherwise, Lessee shall pay to the proper local authority all such taxes, assessments and/or similar charges in lieu of taxes which at any time during the lease term may be taxed, assessed or imposed upon the Lessor or Lessee with respect to or upon the leased premises or any part thereof, or upon the occupier thereof, or upon the use or operation of the lease premises, and in such event, the additional rent provided by sub-paragraph (a) of this paragraph 11 shall be renegotiated so as to provide for a reduction of said additional rent in an amount (not to exceed the said additional rent) representing the actual amount of taxes, assessments and/or similar charges in lieu of taxes properly due and payable during the lease term or applicable portion thereof."

7. c. 874, § 3, 69 Stat. 722, 40 U.S.C.A. § 523.

8. The filing of the complaint in this case followed on May 13, 1957.

Concurrently with the delivery of the deed the General Services Administrator entered into a "side agreement" with Mesta Machine Company whereby the United States obligated itself to continue the litigation then pending to vacate the alleged illegal tax liens and to assume liability therefor should a judgment be entered against the United States. Following the dismissal of the pending suit this action was brought.

On the foregoing stipulated facts, among others, the district court dismissed the complaint after concluding that the case before it was distinguishable on the facts from Board of County Commissioners of Sedgwick County v. United States, Ct.Cl.1952, 105 F.Supp. 995; that immunity with respect to the tax on the property was waived by the Government; that it was estopped from claiming its sovereign immunity and that it had failed to show a justiciable interest in the property.[9]

The district court found that under Section 8[10] of the Reconstruction Finance Corporation Act (47 Stat. 8, 15 U.S.C.A. § 607), the constitutional immunity to local taxation upon real property owned by the Reconstruction Finance Corporation was waived.

It further found as follows:

"* * * Commencing as we do with taxability under the facts in this case, if it was not waived, Plancor 765 became exempt on September 4, 1947, which was the date of the acceptance of responsibility by the WAA (Exhibit 2). But the government in this case did not choose to insist upon continued tax immunity. It directed and subjected the property to local taxation by its lessee United Engineering, from 1947 through and including 1953 and to July 13, 1954. On the merits of this controversy, then, I hold that the United States, prior to July 13, 1954, had not withdrawn its waiver

of immunity from the imposition of local taxes on Plancor 765. Under Pennsylvania law, the property was placed on the assessment rolls for the year 1954 in the fall of 1953. 72 P.S. § 5020-401(e). All the local taxes were levied before April 13, 1954, when the tax of the school district of New Castle was levied. The government made no change in the taxability of this property from the erection of the plant until July 13, 1954. At the latter date, the government itself took over the amount of local taxes. Congress has since directed that the 1955 and 1956 taxes be paid in accordance with the statute." 173 F.Supp. at pages 313, 314.

In concluding that there had been a waiver of immunity the court commented:

"On the merits the government asks that this court strike down the lien of these taxes. Under the factual situation, that does not seem fair, just or right. The government here was the owner of and renting a property declared surplus." 173 F. Supp. at page 314.

Since the opinion of the district court, filed on April 19, 1959, the Supreme Court, on May 23, 1960, considered relatively the same issue in Rohr Aircraft Corporation v. County of San Diego, 80 S.Ct. 1050. In that case the County of San Diego assessed ad valorem real property taxes on property against the Reconstruction Finance Corporation as owner for the fiscal years 1951 to 1955, inclusive. Pursuant to a declaration made May 29, 1946, the Reconstruction Finance Corporation had declared the subject property surplus to its needs and the War Assets Administration and the General Services Administration as its successor retained possession of it until September 1, 1949, during which period it was used as a storage depot and a sales center for surplus proper-

9. See footnote 1, supra.

10. Section 8 (as amended): "* * * any real property of the Corporation shall be subject to * * * State, Territorial, county, municipal, or local taxation, to the same extent according to its value as other real property is taxed."

ty. On September 1, 1949, it was rented to Rohr Aircraft's predecessor in a lease in which the lessor was described as the "Reconstruction Finance Corporation * * * and the United States of America, both acting by and through the General Services Administration under * * * the Surplus Property Act of 1944." By the terms of the lease the lessee undertook to pay all taxes legally assessed against the property. Rohr Aircraft paid the taxes and, after claims for refund were denied, filed suit to recover the taxes. The trial court found against it and the Supreme Court of California affirmed. 51 Cal.2d 759, 336 P.2d 521. It took the view that real property declared to be surplus under the Surplus Act of 1944,[11] record title to which is in the Reconstruction Finance Corporation, continues to be subject to local taxation under the waiver of the exemption provided for by Section 8 of the Reconstruction Finance Act. In Continental Motors Corp. v. Township of Muskegon, 1956, 346 Mich. 141, 77 N.W.2d 370, the Supreme Court of Michigan held similarly. To resolve the conflict engendered by the opposite conclusion of the Court of Claims in the Board of County Commissioners of Sedgwick County v. United States, supra, the Supreme Court agreed to hear the case.

The Court reviewed the history of the Reconstruction Finance Corporation, pointing out that it was originally created for the purpose of making loans to distressed business concerns. It noted that:

" * * * Apparently Congress was concerned that property obtained by the Corporation through its financial operations in aid of economic recovery policies would lose its taxable status * * *." 80 S.Ct. at page 1052.

Hence, it reasoned, the right of state and local governments to tax property coming into the hands of the Corporation was preserved through Section 8 of the Act. Note was also taken of the widening sphere of functions of the Corporation in 1940 with the approach of World War II and the necessity for the acquisition of large tracts of land resulting in the extension of the waiver to real estate holdings of the Defense Plant Corporation. See 55 Stat. 248.

But with the passage of the War Surplus Act of 1944 the functions of the Reconstruction Finance Corporation with relation to such lands changed. Of this the Court commented:

"It appears to us that the purpose of the waiver provision was to permit taxation of real property being used by the Reconstruction Finance Corporation in the performance of its functions. Such use was terminated when the property was declared surplus in 1946. At that time another agency of the Government took both the occupancy and complete control of the property for the purpose of management and disposition. The Reconstruction Finance Corporation, under the specific provisions of the Surplus Property Act, thereby lost all power and control over the property, which came into the hands of the Administrator for the account of the United States, any proceeds therefrom being ordered paid into the United States Treasury. Thereafter, the Administrator elected, as he had the statutory power to do, to lease the property to appellant's predecessor. The real property, however, remained in the account of the United States, not the Reconstruction Finance Corporation * * *. We think that the land here was 'owned' by the United States." 80 S.Ct. at page 1053.

The Court assayed the decision of the Supreme Court of California in this case and that of the Court of Claims in Sedgwick County, supra, and said:

" * * * We agree with the Court of Claims 'that the cloak of immunity descended upon the property [when it was declared surplus]

---

11. See footnote 2, supra.

and no tax liability for the property could arise thereafter.'" [105 F. Supp. 1002.] 80 S.Ct. at page 1054.

The facts in the Rohr case are generally the same as in the case at bar. There, too, the property was leased for a completely private purpose of the tenant but the waiver of immunity of the sovereign to taxation found by the district court in this case was denied.

The district court buttressed its position that immunity must be denied with the theory that the United States was equitably estopped from claiming it. Apparently the basis for that conclusion was that prior to 1954 the taxes were paid by the government itself until the first lease under the War Surplus Act and thereafter the taxes were paid by the government's lessee; and that the government, under the factual situation as found by the court, in renting the property to a private lessee, was exercising a proprietary function. That there was a prior waiver by Congress of the immunity furnishes no basis to estop the government from later claiming it. Maricopa County v. Valley Nat. Bank, 1943, 318 U.S. 357, 362, 63 S.Ct. 587, 87 L.Ed. 834. The activities involved in this case were the lawful acts of corporations and agencies created by the United States and were governmental in nature. See Federal Land Bank of St. Paul v. Bismark Lumber Co., 1941, 314 U.S. 95, 102, 62 S.Ct. 1, 86 L.Ed. 65; Mayo v. United States, 1943, 319 U.S. 441, 448, 63 S.Ct. 1137, 87 L.Ed. 1504. The taxes were paid by the government only under the express authority of the Reconstruction Finance Corporation Act. Otherwise they were paid by the lessee, induced by the government's requirements in the provisions of its leases. Evidently both the government's officials and the lessee regarded the imposition of taxes as lawful. That they were not, forms no basis for an estoppel against the government, equitable or otherwise, to claim its sovereign immunity against the local taxes. Utah Power & Light Co. v. United States, 1917, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791; Automobile Club of

Michigan v. Commissioner, 1957, 353 U.S. 180, 183, 77 S.Ct. 707, 1 L.Ed.2d 746. In view of the foregoing we find it unnecessary to discuss the failure to show here the essential factual elements to establish an equitable estoppel in any event.

It should be recalled that a quit claim deed for this property was delivered to the United States by the Reconstruction Finance Corporation on June 13, 1950 and recorded on December 15, 1953. Of this the district court commented:

"* * * I hold that the execution and delivery of the quit claim deed and the recording of it made no change in the tax status of Plancor 765 * * *." 173 F.Supp. at page 313.

But the Court in Rohr Aircraft remarked:

"There would be no question as to the exemption of the real property involved had the record title been in the name of the United States * * *." 80 S.Ct. at page 1053.

Finally the district court concluded that the appellant's complaint must be dismissed because it conveyed the property in question to the Mesta Machine Company on July 19, 1956 without including any warranty of title in its deed. It held:

"* * * There is nothing in the complaint in the instant action nor is there any evidence in the agreed statement of facts or elsewhere that the security for the payment of the purchase money is in any way jeopardized by the so-called tax liens against Plancor 765. It is true that the government says that the 'National Security Clause' which was made a part of the deed to Mesta may be jeopardized by the tax liens. Such a possibility is so remote and incidental as not to justify this court in refusing to strike down these tax liens. See S.R.A. Inc. v. State of Minnesota, supra. Further, in the opinion of this court there is no justiciable issue between

the government and these defendants. It is not a 'case or controversy' within the meaning of the constitution, Article 3, § 2, in which the jurisdiction of the United States District Court may be invoked. Moreover, defendants assert before this court and this court will presume that the defendants will abide by their assertion, that they will not subject any interest of the United States in the property to tax sale or otherwise jeopardize the government's mortgage security * * *." 173 F.Supp. at page 315.

It is clear that the United States by its "side agreement" obligated itself to continue the litigation pending at the time it sold the property and that if unsuccessful therein would assume liability for the payment of the liens or would

"otherwise cause the lien of said taxes for the year 1954 * * * to be withdrawn, settled or otherwise expunged from the record so that there shall be no lien or purported lien for said taxes."

■ We do not agree with the district court. The agreement was tantamount to a warranty and the unpaid taxes for 1954 constitute a lien against the property. The United States has an interest in removing the lien in accordance with the obligation of its agreement and in view of the substantial incumbrance it retains against the property by way of its mortgage. Contrary to the district court's finding we must conclude that it had before it a justiciable issue between the appellant and the appellees over which its jurisdiction had been properly invoked under 28 U.S.C.A. § 1345.

We have not overlooked the argument of the appellees that Rohr Aircraft decided only the narrow issue that property which was taxable in the hands of the Reconstruction Finance Corporation "becomes immune when custody and possession are transferred to another agency

of the United States." They emphasize that the latter decision:

"* * * says nothing on the doctrine of the Michigan cases that a state may impose a non-discriminatory tax on the lessees of Federal property and these cases are not cited in the opinion."

They contend that the instant tax is valid under the doctrine laid down in a trilogy of Michigan cases decided by the United States Supreme Court on March 3, 1958.[12] However, the Michigan cases are clearly distinguishable from the present case. *In none of those cases was there a tax on the federal government or its property.* The effect of the Michigan statute authorizing the taxes therein imposed is made clear by the Court in United States v. City of Detroit, 355 U.S. 466, at page 469, 78 S.Ct. 474, at page 476, 2 L.Ed.2d 424, where it said:

"The Michigan statute challenged here imposes a tax on private lessees and users of tax-exempt property who use such property in a business conducted for profit. Any taxes due under the statute are the personal obligation of the private lessee or user. The owner is not liable for their payment nor is the property itself subject to any lien if they remain unpaid. So far as the United States is concerned as the owner of the exempt property used in this case it seems clear that there was no attempt to levy against its property or treasury."

Here the tax is levied directly on the property of the United States and that property is subjected to a lien. It is patent that what was levied was nothing "other than the old and widely used ad valorem general property tax" and as such it was invalid. United States v. Allegheny County, 1944, 332 U.S. 174, 64 S.Ct. 908, 914, 88 L.Ed. 1209.

The appellees have not brought themselves outside the established doctrine

---

12. United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424; United States v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436; City of Detroit v. Murray Corporation, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441.

that federal property is immune from local taxation regardless of the use to which it may be put. McCulloch v. State of Maryland, 1819, 4 Wheat. 316, 4 L.Ed. 579; United States v. Allegheny County, supra; Board of County Commissioners of Sedgwick County v. United States, supra; Rohr Aircraft v. San Diego County, supra.

The vigor with which the appellees seek to sustain the taxes in this case, and the sympathetic view of the trial judge are understandable in the light of the hardship wrought upon local authorities when they are confronted with tax immune ratables which would otherwise share the mounting costs of their governmental service. However, alleviation of the hardship for the year 1954 could only come by way of legislative grant. That there is absent any intent upon the part of Congress to make relief available prior to the 1955 statute (40 U.S.C.A. §§ 521–524) is made clear by the concluding passages of the opinion of the Supreme Court in Rohr Aircraft, supra, 80 S.Ct. 1050.

Accordingly the order of the district court of April 17, 1959, dismissing the complaint and civil action is reversed and judgment will be entered in favor of the United States.