383 P.2d 350

**The AMERICAN OIL COMPANY, a Maryland corporation, Plaintiff-Respondent, and Cross-Appellant,**

v.

**P. G. NEILL, former Tax Collector of the State of Idaho, and Floyd West, Acting Tax Collector of the State of Idaho, Defendants-Appellants and Cross-Respondents.**

No. 9113.

Supreme Court of Idaho.

June 20, 1963.

Frank L. Benson, Atty. Gen., William M. Smith, Asst. Atty. Gen., Boise, for appellant.

Calvin Dworshak, Jay L. Webb, Boise, for respondents.

McFADDEN, Justice.

This action, originally brought by Utah Oil Refining Company, is to recover motor fuels tax payments made under protest to P. G. Neill, State Tax Collector. The payments were made during the period between January and November, 1960, for motor fuels delivered between November 1, 1959 and October 30, 1960. Subsequent to instituting the action The American Oil Company, as successor of Utah Oil Refining Company, was substituted as the plaintiff; P. G. Neill resigned as Tax Collector of the State of Idaho, and Vernon Drown was appointed as acting Tax Collector of the State; Mr. Drown died in office, and Floyd West, was later appointed as the Tax Collector of the State, and named herein as party defendant.

Defendant moved to dismiss the plaintiff's complaint; plaintiff moved for summary judgment, and defendant moved to dismiss the plaintiff's motion for summary judgment. The summary judgment was entered for the plaintiff in the principal amount prayed for, but without interest. The judgment provided, inter alia:

"That the Defendants, P. G. Neill, former Tax Collector of the State of Idaho, and Vernon E. Drown, Acting Tax Collector of the State of Idaho, and each of them, are hereby directed to refund and pay, or cause to be paid, to the Plaintiff, the American Oil Company, a corporation, the sum of $86,181.30 hereby found to have been illegally and erroneously demanded and collected from the Utah Oil Refining Company, a corporation, predecessor in interest to the Plaintiff herein, as motor fuels taxes upon the transaction set forth in the complaint and supplemental complaints on file herein, PROVIDED HOWEVER, That this judgment shall not be satisfied out of the individual property of said Defendants or either of them."

Defendants appealed from the summary judgment and plaintiff cross appealed from that portion of the summary judgment refusing plaintiff any interest, from the portion thereof holding the defendants not personally liable, and denying plaintiff its costs;

The defendants' assignments are as follows:

"1. The court erred in ruling and accordingly deciding that the federal

commerce clause is involved, ruling that title to gasoline passed outside the State of Idaho and was imported into the State by its owner, on grounds and for the reasons that said ruling and holding is contrary to the evidence adduced and the law of the case.

"2. The court erred in ruling and accordingly holding that title 49, chapter 7 of the Idaho Code and particularly I. C. § 49-1201 as amended 1959 cannot be construed to impose a motor fuels tax upon appellant herein on account of its attempted passage of title outside of the State of *Utah* (sic.), when in truth and in fact the parties intended to, and they did pass title within the State of Idaho, and therein use and consume the gasoline.

"3. The court erred in ruling and accordingly holding that the Federal Government is the ultimate consumer and therefore soverign immunity to taxation applies on grounds and for the reasons that such holding is contrary to the facts adduced and the law in such [case] made and provided."

Defendant summarize their position on this appeal by recital of the following two issues:

"1. In instances where the ultimate consumer is the Government of the United States of America, can the state impose a motor fuel tax?"

"2. Is the sovereign State of Idaho bound by the language of the contract or award between the respondent and the agent for the Atomic Energy Commission, or may this court view the transaction as a whole and determine by the actual conduct of the parties that title to the gasoline in question passed at Arco, Idaho rather than in Utah?".

In order to understand the position of the respective parties concerning these assignments of error, a rather detailed statement of the facts leading to this litigation is essential.

The Federal Government, acting through the Atomic Energy Commission (referred to as the A. E. C.) operates facilities at Idaho Falls, and at the National Reactor Testing Station northwest from Idaho Falls.

The Phillips Petroleum Company is a contractor with the A. E. C. and on its behalf actually performs certain required services, including the operation of busses between Idaho Falls, and the National Reactor Testing Station. The gasoline, the basis of the controverted tax, was consumed in motor vehicles owned by the Federal Government, and used in transporting personnel connected with the A. E. C. A fee was charged for the transportation of persons using the Government busses, which fee accrued to the use and benefit of the Government. Losses in-

volved in operating the busses were fully absorbed by the Government.

The Federal Government by the General Service Administration, a Federal agency, (sometimes referred to as G. S. A.) issued invitation for bids for supplying gasoline for activities in Idaho, Montana, Oregon and Washington, for the period from November 1, 1959 through October 31, 1960. Included in this invitation (along with other items) were items Nos. 63 and 64 covering the needs for gasoline for the A. E. C., at Idaho Falls, and at the National Reactor Testing Station. Utah Oil Refining Company, submitted its formal bid on these items (with other bid items) to the General Service Administration office at Seattle, Washington.

On September 15, 1959, the G. S. A. accepted Utah Oil Refining Company's bid for listed items Nos. 63 and 64. In the bid as submitted, the bidder stated that the Idaho State tax of $.06 per gallon was included in the bid. Both items Nos. 63 and 64 were submitted in alternative forms.

Item No. 63 was for 200,000 gallons of gasoline for Idaho Falls, with tank truck delivery quoted. The first alternative bid was as follows:

"(a) f. o. b. bulk plant posted price date of bid $.1905 Location of bulk plant Salt Lake City."

Under this alternate bid maximum price per gallon, after deductions was $.1580 per gallon "Ex. State Tax." The other alternate was as follows:

"(b) f. o. b. activity, transport truck delivered price date of bid: $.2755."

Under this alternate bid, the maximum price per gallon, after deductions was $.2418 per gallon.

Item No. 64 was for 1,000,000 gallons of gasoline for the National Reactor site with identical alternates, except for prices quoted.

The A. E. C. through its operating agent periodically placed orders under the contract for delivery of the gasoline at the bulk plant at Salt Lake City. Common carriers selected and paid by the A. E. C. transported the gasoline from Utah to government owned storage tanks in Idaho. Monthly thereafter Utah Oil Refining Company, submitted the reports required by I.C. § 49–1210, and paid under protest to the State Tax Collector the $.06 per gallon Motor Fuels Tax. Utah Oil Refining Company, a Delaware Corporation, authorized to do business in Idaho, was a licensed dealer as defined by the provisions of that chapter. The A. E. C. is not a licensed dealer. The status of Phillips Petroleum Company, as a licensed dealer, is immaterial to this decision, for its status is only that of a contractor of the A. E. C., at the Idaho Falls and National Reactor Testing station.

In 1933 the Legislature of Idaho enacted an excise tax on motor fuels, which act later amended in subsequent legislative sessions is not contained in Chapter 12, Title 49, Idaho Code, with the "Special Fuel Use Tax Act" (S.L.1953, Ch. 262). The 1933 act, as amended, fixes an excise tax on motor fuels. A "dealer" in motor fuels is defined as any person, (which includes individuals, firms, corporations, etc.), who first receives motor fuels in this state, as the term "received" is there defined.

All dealers are required to hold a permit by the State Tax Collector, issued upon application and posting of bond conditioned on compliance with the law. Such permit is required before any person can import, receive, use, sell or distribute motor fuels; non-compliance with the law subjects any persons to criminal penalties and civil liabilities.

Each dealer is required to report monthly the gallonage of all motor fuels received for the preceding month, and to pay the $.06 per gallon tax. Provisions are made for deductions from the gallonage reported for fuels exported, fuels sold or used in aircraft (which fuels bear a different tax), and fuels used in a non-highway activities, plus a 2% shrinkage allowance. The proceeds of the tax are paid by the Tax Collector to the State Treasurer for deposit in the dedicated highway funds of the state, including a special fund to be used for payment of lawful refunds of the tax. Excepting for the fuels contained in the fuel tank of a vehicle, the act requires payment of the tax by the vehicle owner on all fuels imparted into the state by motor vehicles, in the event of failure of the "dealer", or "individual" for whom the importation is made, to pay the tax.

By amendments to the 1933 act the excise tax becomes due when the motor fuel is "received" by a licensed dealer. The 1959 amendment (S.L.1959, Ch. 75), here involved, provides:

"I.C. § 49–1201—Definitions. * * *

*    *    *    *    *    *

"(g) * * * Motor Fuel, for the purpose of determining liability for the payment of the tax imposed by section 49–1210, shall be considered to be "received" in the following cases:

"1. * * *.

"2. Motor fuel imported into this state other than that placed in storage at refineries or pipe line terminals in this state shall be considered to be received immediately after the same is unloaded and by the person who is the owner thereof at such time * if such person is a licensed dealer; otherwise such motor fuel shall be considered to be received by the person who owned such fuel immediately prior to its being

unloaded; provided, however, motor fuels shipped or brought into this state by a qualified dealer, which fuel is sold and delivered in this state directly to a person who is not the holder of an uncanceled dealer permit, shall be considered to have been received by the dealer, shipping or bringing the same into this state; *further provided that motor fuel which is in any manner supplied, sold or furnished to any person or agency, whatsoever, not the holder of an uncanceled Idaho dealer permit, by an Idaho licensed dealer, for importation into the state of Idaho from a point of origin outside the state, shall be considered to be received by the Idaho licensed dealer so supplying, selling, or furnishing such motor fuel, immediately after the imported motor fuel has been unloaded in the state of Idaho.* \* \* \*" (Emphasis added)

Here the motor fuels on which the tax was paid were sold or supplied to an agency, not a holder of an uncanceled dealer permit, for importation into this state from Utah. These facts bring this action directly into the purview of the portion of the statute above underlined. The motor fuels sold, under the provisions of the act, must thus be considered to have been received by the Utah Oil Refining Company, for tax purposes, the moment the imported fuels were unloaded in the State of Idaho.

It must be pointed out that this section of the statute makes no distinction between the case where an Idaho dealer sells, inside the State, to an unlicensed person, from the case where he sells, supplies or furnishes the fuels to an unlicensed person for importation into the State. The passage of title to the fuels is not the criterion upon which the tax operates; the incident which establishes the liability for payment of the tax by the licensed dealer is its "receiving" the fuels. The statute creates a continuing obligation on the dealer as to fuels sold, supplied, or furnished outside of this state for importation herein. This obligation of the first licensed dealer is only discharged upon its transacting of business with another licensed dealer, or by payment of the tax.

It is contended by respondents, as pointed out by the trial court in its memorandum, that title to the gasoline passed from Utah Oil Refining Company to the A. E. C. at the bulk plant in Salt Lake City. The trial court and respondent are correct in this conclusion. When title passes is a question of intention of the parties. Uniform Sales Act, § 18; Utah Code Annotated § 60–2–2; Shipman v. Kloppenburg, 72 Idaho 321, 240 P.2d 1151; Union Portland Cement Co., v. State Tax Commission, 110 Utah 135, 170 P.2d 164, modified on rehearing on unrelated issue, 110 Utah 152, 176 P.2d 879.

■ There is presented in this case the principal issue whether the statute in question impinges upon the Commerce Clause, (U.S.Const. Art. 1 § 8(3), and upon the Due Process Clause of the Fourteenth Amendment. It is further contended that the imposition of this tax violates the due process clause of Idaho Constitution, Art. 1, § 13. In considering these constitutional questions it is essential to bear in mind that the burden of showing unconstitutionality of a statute is upon the party asserting it, and the invalidity must be clearly shown. Eberle v. Nielson, 78 Idaho 572, 306 P.2d 1083; Curtis v. Pfost, 53 Idaho 1, 21 P.2d 73; Boughton v. Price, 70 Idaho 243, 215 P.2d 286; Rich v. Williams, 81 Idaho 311, 341 P.2d 432; Caesar v. Williams, 84 Idaho 254, 371 P.2d 241. A legislative act is presumed to be constitutional and all reasonable doubt as to its constitutionality must be resolved in favor of its validity. Sanderson v. Salmon River Canal Co., 45 Idaho 244, 263 P. 32; Wanke v. Ziebarth Const. Co., 69 Idaho 64, 202 P.2d 384; Rich v. Williams, supra; Caesar v. Williams, supra.

Plaintiff asserts that this tax cannot be sustained against the constitutional challenge on the theory that it is a "sales" tax, for the reason that the "sale" took place outside the state and a tax on it would violate the due process clause of the Federal Constitution, relying upon McLeod v. J. E. Dilworth Co., 322 U.S. 327, 64 S.Ct. 1023, 88 L.Ed. 1304. Plaintiff also claims this tax cannot be sustained upon the theory that it is a "use" tax, for the "use" is by an agency of the Federal Government, immune from imposition of taxes by the State.

The legal issues raised by those contentions have been serious and difficult ones for the Supreme Court of the United States and have been the subject of numerous articles by legal writers. See: October 1960 issue of Virginia Law Review, (46 Va. Law Rev. pgs. 1051 et seq.). The Supreme Court has discussed the basic problem of the commerce clause in these words:

"The recurring problem is to resolve a conflict between the Constitution's mandate that trade between the states be permitted to flow freely without unnecessary obstruction from any source, and the state's rightful desire to require that interstate business bear its proper share of the costs of local government in return for benefits received." Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 166, 74 S.Ct. 396, 98 L.Ed. 583.

"Commerce between the States having grown up like Topsy, the Congress meanwhile not having undertaken to regulate taxation of it, and the States having understandably persisted in their efforts to get some return for the substantial benefits they have afforded it, there is little wonder that there has been no end of cases testing out state

tax levies. The resulting judicial application of constitutional principles to specific state statutes leaves much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation. This Court alone has handed down some three hundred full-dress opinions spread through slightly more than that number of our reports." N. W. States Portland Cement Co. v. State of Minn., 358 U.S. 450, 457, 79 S.Ct. 357, 3 L.Ed.2d 421.

Paul J. Hartman, Professor of Law, Vanderbilt University, in his article, "State Taxation of Interstate Commerce," 46 Va. Law Review, 1051, at page 1059, in discussing the effect of the due process clause states:

"* * * The restraining power of the due process clause, it might be said, keeps the taxing power at home. It prevents a state from fixing its tax talons on extra-territorial values. The absence of any sufficient 'nexus' or connection in fact between the taxed business and the taxing state would be enough in itself for upsetting a tax on due process grounds. The term 'nexus' has become an indespensible part of the tax vocabulary, when reference is to the requisites of the due process clause as applied to state and local taxation of multistate operations.

Consistent with these nexus requirements a state can exert its taxing power only in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred  *  *  *" (Wisconsin v. J. C. Penney Co., 311 U.S. 435, 444, 61 S.Ct. 246, 85 L.Ed. 267.)

In McLeod v. J. E. Dilworth Co., supra, the Supreme Court struck down as unconstitutional the Arkansas sales tax when applied to an order solicited by a drummer for a Tennessee company. It was held that Arkansas could not collect a sales tax when the order was solicited by a drummer in that state for acceptance in Tennessee by the seller, who then shipped the goods directly to the Arkansas buyer, title passing in Tennessee. The court agreed that a sales tax might have the same result as a use tax, but rejected the argument that the sales tax could be sustained because the seller would have been required to pay a use tax to Arkansas. In discussing the distinction between a "sales" tax and an "use" tax, the court stated:

"A sales tax and a use tax in many instances may bring about the same result. But they are different in conception, are assessments upon different transactions, and in the interlacings of the two legislative authorities within our federation may have to justify themselves on different constitutional

grounds. A sales tax is a tax on the freedom of purchase—a freedom which wartime restrictions serve to emphasize. A use tax is a tax on the enjoyment of that which was purchased. In view of the differences in the basis of these two taxes and the differences in the relation of the taxing state to them, a tax on an interstate sale like the one before us and unlike the tax on the enjoyment of the goods sold, involves an assumption of power by a State which the Commerce Clause was meant to end. The very purpose of the Commerce Clause was to create an area of free trade among the several States. *That clause vested the power of taxing a transaction forming an unbroken process of interstate commerce in the Congress, not in the States.

"The difference in substance between a sales and a use tax was adverted to in the leading case sustaining a tax on the use after a sale had spent its interstate character: 'A tax upon a use so closely connected with delivery as to be in substance a part thereof might be subject to the same objections that would be applicable to a tax upon the sale itself.' Henneford v. Silas Mason Co., 300 U.S. 577, 583, 57 S.Ct. 524, 527, 81 L.Ed. 814 [819]. Thus we are not dealing with matters of nomenclature even though they be matters of nicety. 'The state court could not render valid, by misdescribing it, a tax law which in substance and effect was repugnant to the federal Constitution; neither can it render unconstitutional a tax, that in its actual effect violates no constitutional provision, by inaccurately defining it.' Wagner v. City of Covington, 251 U.S. 95, 102, 104, 40 S. Ct. 93, 94, 64 L.Ed. 157, 168. Though sales and use taxes may secure the same revenues and serve complementary purposes, they are, as we have indicated, taxes on different transactions and for different opportunities afforded by a State."

The distinction between these two types of tax as discussed by the majority opinion in McLeod v. J. E. Dilworth Co., supra, was rejected by Mr. Justice Douglas in his dissenting opinion in that case, where he stated:

"It is not enough to say that the use tax and the sales tax are different. A use tax may of course have a wider range of application than a sales tax. Henneford v. Silas Mason Co., 300 U. S. 577, 57 S.Ct. 524, 81 L.Ed. 814. But a use tax and a sales tax applied at the very end of an interstate transaction have precisely the same economic incidence."

It is noteworthy that the same day the opinion in McLeod v. J. E. Dilworth Co., (supra) was announced, the Supreme Court

of the United States rendered its opinion in General Trading Co. v. State Tax Comm'n., 322 U.S. 335, 64 S.Ct. 1028, 88 L.Ed. 1309. The majority opinion in both of these cases was written by Mr. Justice Frankfurter. The end result of these two cases was that insofar as the imposition of a use tax was concerned when imposed in a business involved in interstate commerce, such was not unconstitutional as being discriminatory against interstate commerce, or contrary to the due process provision, but that a sales tax would be.

In General Trading Co. v. State Tax Comm'n. (supra) the Iowa Tax Commission brought suit in an Iowa court against General Trading Co., for taxes assessed under the Iowa use tax law with respect to tangible personal property sold and delivered to Iowa "users" of the property. General Trading was a Minnesota corporation, and had not qualified to do business, and did not maintain any office, branch or warehouse, in Iowa. The property in respect of which the use tax was levied was sent to Iowa in response to orders solicited and obtained by salesmen traveling into Iowa from their Minnesota headquarters. The orders were subject to acceptance in Minnesota, after which the goods were sent to Iowa by common carrier. As stated above, the Supreme Court held such tax did not violate the federal constitution, although it again reiterated that "—no State can tax the privilege of doing interstate business

* * *. That is within the protection of the Commerce Clause and subject to the power of Congress."

Mr. Justice Rutledge specially concurred in General Trading Co. v. State Tax Comm'n., supra, and in International Harvester Co. v. Department of Treasury, 322 U.S. 340, 64 S.Ct. 1019, 88 L.Ed. 1313 (opinion being rendered the same day) and dissented in McLeod v. J. E. Dilworth, supra. In his special opinion discussing these cases, he points out with clarity the danger of categorizing of any one type of tax as "sales" or "use", as follows:

"The Court's different treatment of the two taxes does not result from any substantial difference in the facts under which they are levied or the effects they may have on interstate trade. It arises rather from applying different constitutional provisions to the substantially identical taxes, in the one case to invalidate that of Arkansas, in the other to sustain that of Iowa. Due process destroys the former. Absence of undue burden upon interstate commerce sustains the latter.

"It would seem obvious that neither tax of its own force can impose a greater burden upon the interstate transaction to which it applies than it places upon the wholly local trade of the same character with which that transaction competes. By paying the Arkansas tax

the Tennessee seller will pay no more than an Arkansas seller of the same goods to the same Arkansas buyer; and the latter will pay no more to the Tennessee seller than to an Arkansas vendor, on account of the tax, in absorbing its burden. The same thing is true of the Iowa tax in its incidence upon the sale by the Minnesota vendor. The cases are not different in the burden the two taxes placed upon the interstate transactions. Nor in my opinion are they different in the existence of due process to sustain the taxes.

" 'Due process' and 'commerce clause' conceptions are not always sharply separable in dealing with these problems. Cf. e. g., Western U. Teleg. Co. v. Kansas, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355. To some extent they overlap. If there is a want of due process to sustain the tax, by that fact alone any burden the tax imposes on the commerce among the states becomes 'undue'. But, though overlapping the two conceptions are not identical. There may be more than sufficient factual connections, with economic and legal effects, between the transaction and the taxing state to sustain the tax as against due process objections. Yet it may fall because of its burdening effect upon the commerce. And, although the two notions cannot always be separated, clarity of consideration and of decision would be promoted if the two issues are approached, where they are presented, at least tentatively as if they were separate and distinct, not intermingled ones.

"Thus, in the case from Arkansas no more than in that from Iowa should there be difficulty in finding due process connections with the taxing state sufficient to sustain the tax. As in the Iowa case, the goods are sold and shipped to Arkansas buyers. Arkansas is the consuming state, the market these goods seek and find. They find it by virtue of a continuous course of solicitation there by the Tennessee seller. The old notion that 'mere solicitation' is not 'doing business' when it is regular, continuous and persistent is fast losing its force. In the General Trading Co. Case it loses force altogether, for the Iowa statute defines this process in terms as 'a retailer maintaining a place of business in this state.' The Iowa Supreme Court sustains the definition and this Court gives effect to its decision in upholding the tax. Fiction the definition may be; but it is fiction with substance because, for every relevant constitutional consideration affecting taxation of transactions, regular, continuous, persistent solicitation has the same economic, and should have the same legal, consequences as does maintaining an office for soliciting

and even contracting purposes or maintaining a place of business, where the goods actually are shipped into the state from without for delivery to the particular buyer. There is no difference between the Iowa and the Arkansas situations in this respect. Both involve continuous, regular, and not intermittent or casual courses of solicitation. Both involve the shipment of goods from without to a buyer within the state. Both involve taxation by the state of the market. And if these substantial connections are sufficient to underpin the tax with due process in the one case, they are also in the other."

In discussing the effect of the commerce clause of the Federal Constitution, Justice Rutledge points out:

"When, however, the issue is turned from due process to the prohibitive effect of the commerce clause, more substantial considerations arise from the fact that both the state of origin and that of market exert or may exert their taxing powers upon the interstate transaction. The long history of this problem boils down in general statement to the formula that the states, by virtue of the force of the commerce clause, may not unduly burder interstate commerce. This resolves itself into various collary formulations. One is that a state may not single out interstate commerce for special tax burden. (citing cases). Nor may it discriminate against interstate commerce and in favor of its local trade. (citing cases). Again, the state may not impose cumulative burdens upon interstate trade or commerce. (citing cases). Thus, the state may not impose certain taxes on interstate commerce, its incidents or instrumentalities, which are no more in amount or burden than it places on its local business, not because this of itself is discriminatory, cumulative or special or would violate due process, but because other states also may have the right constitutionally, apart from the commerce clause, to tax the same thing and either the actuality or the risk of their doing so makes the total burden cumulative, discriminatory or special."

The Supreme Court of the United States subsequently was presented with a similar problem in Miller Bros. v. Maryland, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744. That case involved taxation of Miller Bros., a Delaware corporation, under a Maryland "use" tax.

The corporation operated a store in Delaware; some of its Maryland customers came to Delaware, made their purchases and took the purchases home. In some cases the purchases were delivered to the Maryland customers by common carrier. Miller Bros. advertised in Delaware news-

papers and radio stations, and also mailed sales circulars to its customers, including the Maryland residents. Upon failure of the corporation to collect and remit the Maryland use tax on its sales to Maryland customers and, seeking to enforce this obligation, the state of Maryland attached one of the Miller Bros., delivery trucks. The Supreme Court held the tax invalid. In reconciling this result with the General Trading Company case the Court through Mr. Justice Jackson, stated:

"* * * But there is a wide gulf between this type of active and aggressive operation within a taxing state and the occasional delivery of goods sold at an out-of-state store with no solicitation other than the incidental effects of general advertising. Here was no invasion or exploitation of the consumer market in Maryland. On the contrary, these sales resulted from purchasers traveling from Maryland to Delaware to exploit its less tax-burdened selling market. That these inhabitants incurred a liability for the use tax when they used, stored or consumed the goods in Maryland, no one doubts. But the burden of collecting or paying their tax cannot be shifted to a foreign merchant in the absence of some jurisdictional basis not present here."

Justice Douglas' dissenting opinion in McLeod v. J. E. Dilworth Co., supra, and Justice Rutledge's special opinion wherein he concurred in General Trading Co. v. State Tax Comm'n., and International Harvester Co. v. Department of Treasury, and also dissented in McLeod v. J. E. Dilworth, are quoted from at length herein, because in our opinion the basic judicial philosophy disclosed therein became the rationale of the Supreme Court's later opinion in Scripto, Inc., v. Carson, hereinafter discussed.

Again a similar problem was presented the Supreme Court in Scripto, Inc., v. Carson, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660. In that case, a Georgia corporation, having no office, distributing warehouse, or other place of business in Florida, and having no bank account, stock of goods, regular employees or agents in or salesman traveling into Florida, shipped merchandise, f. o. b. Atlanta, to Florida customers, pursuant to orders solicited by Florida wholesalers or jobbers. The wholesalers or jobbers were independent contractors working on a commission basis, with no authority to make collections on behalf of Scripto, Inc.

The majority opinion, in reconciling the holding with Miller Bros. v. Maryland, supra, stated:

"Appellant earnestly contends that Miller Bros. Co. v. State of Maryland, supra, is to the contrary. We think not. Miller had no solicitors in Maryland; there was no 'exploitation of the con-

sumer market'; no regular, systematic displaying of its products by catalogs, samples or the like. But, on the contrary, the goods on which Maryland sought to force Miller to collect its tax were sold to residents of Maryland when personally present at Miller's store in Delaware. True, there was an 'occasional' delivery of such purchases by Miller into Maryland, and it did occasionally mail notices of special sales to former customers; but Marylanders went to Delaware to make purchases—Miller did not go to Maryland for sales. Moreover, it was impossible for Miller to determine that goods sold for cash to a customer over the counter at its store in Delaware were to be used and enjoyed in Maryland. This led the court to conclude that Miller would be made 'more vulnerable to liability for another's tax than to a tax on itself.' 347 U.S. at page 346, 74 S.Ct. at page 539. In view of these considerations, we conclude that the 'minimum connections' not present in Miller are more than sufficient here."

Here we are dealing with an excise tax, the purpose of which is to exact a proportionate amount from the users of the highways of this state for a specific purpose,—that of building and maintaining public highways within the state. Union

Pac. R. R. Co. v. Riggs, 66 Idaho 677, 166 P.2d 926. State ex rel. Pfost v. Boise City, 57 Idaho 507, 66 P.2d 1016. The process by which the funds are raised is by placing the immediate burden of the tax on those who are first in a position to control the distribution of the motor fuels throughout the state—on the "dealers" as that term is defined by the statute. The relationship between the State of Idaho, Utah Oil Refining Company, and this tax is more than a casual connection. The gasoline, the subject of the tax, was for use in Idaho. Utah Oil Refining Company, a Delaware corporation, subjected itself to the jurisdiction and control of the state of Idaho, when it became authorized to do business herein, and additionally so when it applied for and was granted a "dealer's" permit authorizing it to enter into the Idaho market as a distributor of motor fuels,—authorizing it to engage in the very activity it now claims is exempt from the tax.

These connections between Utah Oil Refining Company, and the state of Idaho, or the "nexus" are more than incidental. The contract itself, between that oil company and General Service Administration, by the bid items Nos. 63 and 64, was phrased in the alternate for delivery of the gasoline either at the facility or at the bulk plant.

The line of demarcation between the cases where sufficient nexus is found to up-

hold a particular tax, and the cases of such insufficiency of nexus as to invalidate a tax on constitutional grounds, is a tenuous and intangible one. Here, this connection is more substantial and evident than that found in the case of Scripto, Inc., v. Carson, supra; it cannot be said this tax violates the due process clause of either the United States or the Idaho constitutions.

In State of Wisconsin v. J. C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267; the Supreme Court of the United States, speaking through Justice Frankfurter, stated:

"The Constitution is not a formulary. It does not demand of states strict observance of rigid categories nor precision of technical phrasing in their exercise of the most basic power of government, that of taxation. For constitutional purposes the decisive issue turns on the operating incidence of a challenged tax. A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.

" * * * That test is whether property was taken without due process of law, or, if paraphrase we must, wheth-er the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return. The substantial privilege of carrying on business in Wisconsin, which has here been given, clearly supports the tax, and the state has not given the less merely because it has conditioned the demand of the exaction upon happenings outside its own borders. The fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction. * * * "

In the case at bar it is difficult to discern a clear violation of the commerce clause of the Federal Constitution. The inhibition against imposition of a tax upon interstate commerce is not as to the tax itself, but only when the tax becomes an undue burden upon interstate commerce, or when it discriminates against the out of state, as compared to the intrastate vendor. Halliburton Oil Company, Well Cementing Co., v. Reily, (U.S.Sup.Ct.May 13, 1963) 83 S.Ct. 1861. It cannot be said that there is any discrimination between Utah Oil Refining Company as compared to a local "dealer"; both are subject to an identical tax burden as it relates to the importation,.

receiving or sale of gasoline. No undue burden on interstate commerce is disclosed by this tax; therefore it is not in violation of the commerce clause of the Federal Constitution. Scripto Inc., v. Carson, (supra), General Trading Co. v. State Tax Commission, (supra).

This appeal presents one remaining issue. Plaintiff asserts that the incidence or burden of this tax falls on an agency of the Federal Government, and hence it cannot be levied against Utah Oil Refining Company, as vendor of the gasoline to the Atomic Energy Commission. Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615, held that the constitutional immunity of the United States from state taxation was not infringed by the exaction of a state sales tax, with which the seller is chargeable but which he is required to collect from the buyer, in respect of materials purchased by a contractor with the United States on a cost plus basis. This was held to be true notwithstanding that under the contract the title to such materials was in the United States on shipment by the seller. In a series of three cases, the Supreme Court of the United States ruled that a Michigan state statute, authorizing taxation of property of the Federal Government held by a private party and used in fulfilling governmental contracts, was not unconstitutional. United States v. City of Detroit, 355 U.S. 466, 78 Sup.Ct. 474, 2 L.Ed.2d 424; United States v. Muskegon, 355 U.S. 484, 78 Sup.Ct. 483, 2 L.Ed.2d 436; Detroit v. Murray Corp., 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441. In United States v. City of Detroit, supra, it was stated:

"This Court has held that a State cannot constitutionally levy a tax directly against the Government of the United States or its property without the consent of Congress. McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579; Van Brocklin v. State of Tennessee, 117 U.S. 151, 6 S.Ct. 670, 29 L.Ed. 845. At the same time it is well settled that the Government's constitutional immunity does not shield private parties with whom is does business from state taxes imposed on them merely because part or all of the financial burden of the tax eventually falls on the Government. See e. g., James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155; Graves v. People of State of New York ex rel. O'Keefe, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927; Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L. Ed. 3. * * *"

We therefore conclude that the tax immunity of the Atomic Energy Commission, if such there be, does not extend to the contractor furnishing the supplies. See: Esso Standard Oil Co. v. Evans, 345 U.S. 495, 73 S.Ct. 800, 97 L.Ed. 1174; Alabama v. King & Boozer, supra; United States

**26**

v. Detroit, supra; United States v. Muske-gon, supra; Detroit v. Murray Corp. supra.

The summary judgment of the trial court is reversed and the trial court is instructed to dismiss the action.

Costs to appellant.

KNUDSON, C. J., McQUADE and TAYLOR, JJ., and DUNLAP, District Judge, concur.