**INDIANA HI–RAIL CORPORATION,**
Petitioner,

v.

**STATE BOARD OF TAX COMMISSIONERS,**
Respondent.

No. 49T10–9407–TA–00192.

Tax Court of Indiana.

Jan. 19, 1996.

---

Richard W. Lorenz, Hickam & Hickam, Spencer, for Petitioner.

Pamela Carter, Attorney General, Brian D. Scott, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, Judge.

Indiana Hi–Rail Corporation (IHR) appeals the State Board of Tax Commissioners' (State Board) final determination assessing its distributable property[1] for the March 1, 1994, assessment date.

## ISSUES

I. Whether the value of property purchased by IHR using federal grant money is fully or partially assessable to IHR.

II. Whether the value of IHR's Wabash River bridge is assessable, and if so, whether the value of the bridge should have been adjusted to reflect abnormal obsolescence.

III. Whether the methodology used by the State Board in valuing IHR's distributable property violates Indiana law and/or the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

## FACTS & PROCEDURAL HISTORY

### A. IHR

IHR is a railroad company[2] with real and personal property located in Indiana. It is a financially stressed company in Chapter 11 bankruptcy.

### B. The Grant Property

Over a number of years, IHR received approximately 2.7 million dollars in federal grant money through programs designed to help railroad companies rehabilitate their tracks. With the federal grant money, IHR purchased property such as rail, ties, and ballasts (the grant property). IHR recorded the acquisition cost of the grant property in its books, and included the grant property in the statement it filed with the State Board for the March 1, 1994, assessment date.[3]

### C. The Bridge

IHR owns a bridge that extends across the Wabash River. The bridge was constructed approximately 100 years ago. All five of the bridge's original piers were built on dry land ("dry piers"). A flood in the spring of 1990, however, caused the Wabash River to change course. As a result, one of the dry piers was enveloped by the river, and it became necessary to replace that pier with a pier built to withstand the river current ("wet pier"). The cost of replacing the single pier was expected to be $200,000. During the course of replacing the pier, however, the contractor damaged a span of the bridge itself, which then had to be replaced as well. The final cost of the work performed on the bridge was $900,000. IHR recorded that cost in its books as a capital expenditure.

### D. The Assessment

For the March 1, 1994, assessment date, the State Board issued a tentative assessment of IHR's distributable property.[4] In arriving at its tentative assessment, the State Board was required to calculate IHR's unit value,[5] and in calculating IHR's unit value,

---

1. Distribute property is "property owned or used by a public utility company that is not locally assessed real property or locally assessed personal property." 50 I.A.C. 5.1–1–9.

2. IND.CODE 6–1.1–8–2(9) defines a "railroad company" as a company which owns or operates:

    (i) a steam or electric railroad;
    (ii) a suburban or interurban railroad;
    (iii) a switching or terminal railroad;
    (iv) a railroad station, track, or bridge; or
    (v) a facility which is part of a railroad system.

3. See IND.CODE 6–1.1–8–19, which provides in relevant part:

    Each year a public utility company shall file a statement concerning the value and description of the property which is either owned or used by the company on the assessment date of that year. The company shall file this statement with the state board of tax commissioners on the form prescribed by the board.

4. See IND.CODE 6–1.1–8–28.

5. "The term 'unit value' means the total value of all the property owned or used by a public utility company." IND.CODE 6–1.1–8–2(16). It is necessary to determine the unit value of a public utility company in order to arrive at the value of its distributable property. IND.CODE 6–1.1–8–26.

the State Board utilized the cost of the grant property and bridge work as recorded in IHR's books.

. IHR objected to the tentative assessment for two reasons. First, IHR asserted that the grant property and bridge work were not assessable. Second, IHR asserted that even if the grant property and bridge work were assessable, the book cost of that property did not reflect its true value, and by utilizing the book cost of that property, the State Board arrived at a unit value figure that was too high, which in turn caused IHR's tentative assessment to be too high.

IHR requested and received a hearing before the State Board. Thereafter, the State Board reduced IHR's assessment. IHR, however, was still dissatisfied with the assessment and filed this original tax appeal. Additional facts will be supplied as necessary.

### STANDARD OF REVIEW

■ When the court considers a property tax appeal brought by a public utility company,[6] its standard of review is prescribed by statute. Specifically, IND.CODE 6–1.1–8–32 provides:

> When a public utility company initiates an appeal under [IND.CODE 6–1.1–8–30], the tax court may set aside the state board of tax commissioners' final assessment and refer the matter to the board with instructions to make another assessment if:
>
> (1) the company shows that the board's final assessment, or the board's appor-

tionment and distribution of the final assessment, is clearly incorrect because the board violated the law or committed fraud; or

> (2) the company shows that the board's final assessment is not supported by substantial evidence.[7]

(Footnote added). *See also GTE North,* 634 N.E.2d at 885.

### DISCUSSION AND ANALYSIS

#### I

■ First, IHR asserts that the State Board improperly assessed the grant property. Specifically, IHR complains that the State Board relied solely on the book cost of the grant property and ignored the fact that a portion of the value of the grant property was subject to the federal government's "constructive beneficial interest" which, IHR insists, is not taxable under IND.CODE 6–1.1–10–1.[8] *Petitioner's Reply Brief* at 2–5.

In explaining its position, IHR states that under the terms of the various grants, the United States government owns the grant property.[9] IHR, however, is given an opportunity to earn ownership of the grant property slowly over time simply by holding it. Thus, if IHR holds the grant property for a certain number of years, it receives full ownership of the grant property without any obligation to repay the grant money. If, however, IHR liquidates or sells the grant property before it receives full ownership, it is required to repay the federal government a portion of the grant money.[10]

---

6. Under Indiana law, railroad companies are classified as "public utility companies." I.C. 6–1.1–8–2(9); IND.CODE 6–1.1–8–3(b)(6).

7. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *GTE North Inc. v. State Bd. of Tax Comm'rs,* 634 N.E.2d 882, 885, n. 2 (Ind.Tax 1985).

8. I.C. 6–1.1–10–1(a) provides:
The property of the United States and its agencies and instrumentalities is exempt from property taxation to the extent that this state is prohibited by law from taxing it. However, any interest in tangible property of the United States shall be assessed and taxed to the extent this state is not prohibited from taxing it by the Constitution of the United States.

9. The only evidence in the record that the federal government owns the grant property is IHR's statement that the federal government owns the grant property.

10. The portion of the grant money that IHR may be required to repay depends on the length of time that IHR holds the grant property prior to selling it. For example, if IHR were to sell the grant property the same year that it acquired the grant property, IHR would be required to repay the entire grant. *Trial Transcript* at 32. If, however, IHR were to sell the grant property after having held it for five or seven years, IHR would be required to repay only 15 or 20 percent of the grant. *Trial Transcript* at 32.

Consequently, IHR maintains that the State Board, in assessing IHR for the full value of the grant property, improperly accelerated and taxed IHR's future interest in the grant property and, at the same time, illegally taxed the federal government's "constructive beneficial interest" in the grant property. *Transcript of Oral Argument* at 5; *Petitioner's Reply Brief* at 3. IHR asks this court to hold that the State Board may only assess it for the portion of the grant property's value which it is not required to repay the federal government. *Petitioner's Reply Brief* at 4–5.

I.C. 6–1.1–8–1 gives the State Board authority to tax the distributable property of a public utility company. That statute provides:

> The property owned or *used* by a public utility company shall be taxed in the manner prescribed in this chapter. Property used by a public utility company consists of property which the company uses under an agreement whereby the company exercises the beneficial rights of ownership for the major part of a year.

I.C. 6–1.1–8–1 (emphasis added).

██ There is no question that IHR uses the grant property in its railroad business. IHR concedes that "the property in question was subject to [IHR's] ... beneficial rights of ownership for the major part of the year." *Petitioner's Reply Brief* at 2. In fact, IHR even acknowledges that "[f]or all intents and purposes, [the grant property] is Indiana Hi-Rail's property." *Trial Transcript* at 16, *Petitioner's Reply Brief* at 2. Accordingly, the State Board had authority to assess IHR for the grant property based on the fact that IHR *uses* it. I.C. 6–1.1–8–1. It makes no difference that the United States may fully or partially own the grant property, for it is well settled that "a State may ... raise revenues on the basis of property owned by the United States as long as that property is being used by a private citizen or corporation and so long as it is the possession or use by the private citizen that is being taxed." *U.S. v. County of Fresno*, 429 U.S. 452, 462, 97 S.Ct. 699, 704, 50 L.Ed.2d 683, 692 (1977).

*See also City of Detroit v. Murray Corp.*, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958); *United States v. City of Detroit*, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); *United States v. Township of Muskegon*, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958).

The State Board also had authority to assess IHR for the full value of the grant property because IHR enjoys full use of the grant property. The federal government's purported "constructive beneficial interest ... in the grant *funds*," *Petitioner's Reply Brief* at 4 (emphasis added), in no way encumbers IHR's use of the grant *property*. In fact, IHR is so completely vested with the right to use the grant property that it can even sell it.[11]

The court holds that the value of the grant property is fully assessable to IHR. Whether or not the State Board properly determined the assessed value of the grant property, however, is another issue. The court will address that issue in Section III of this opinion.

## II

Next, IHR asserts that the State Board improperly assessed its Wabash River bridge. Specifically, it complains that the value of the work performed on the bridge is not assessable because it is not a "betterment" under 50 I.A.C. 5.1–6–2(e). Alternatively, it complains that if the value of the work performed on the bridge is assessable, then it must be adjusted to account for abnormal obsolescence.

### A. Assessment of the Repair Work as a "Betterment"

██ 50 I.A.C. 5.1–6–2(a) provides that "[t]he cost of depreciable property, ... as recorded on a public utility company's books and records must be utilized in determining the value of the depreciable property subject to assessment." 50 I.A.C. 5.1–6–2(e) further provides that:

> The cost of additions and betterments is added to the original cost of the depreciable personal property. *If an additional*

---

**11.** While the terms of the various grants may discourage IHR from selling the property before a certain date, nothing precludes IHR from selling the grant property.

*part is added or some other change is made in the fixed asset that increases its estimated useful life, production, or efficiency, or converts the property to a different use, it is a betterment.*

(Emphasis added).

In explaining its position, IHR states that before the bridge was damaged by flood, its value had been depreciated to zero, and it had a book value of one dollar ($1.00). *Transcript of Oral Argument* at 8–9. IHR acknowledges that it spent $900,000 on work performed for the bridge, but insists that the cost of that work should not be added to the original cost of the bridge (now depreciated to $1.00) because the work does not constitute a "betterment." IHR explains that the work does not constitute a "betterment" because it was: 1) performed merely to restore the bridge and make it operable once again, 2) it did not enable the bridge to support increased rail traffic or increased rail speeds, and 3) it did not generate increased revenues for IHR.

The State Board, however, maintains that the work performed on the bridge is a "betterment." It explains that because the bridge was restored to use, was made able to withstand a river current, and has one entirely new pier, its estimated useful life was necessarily increased.

Given the standard of review in this case, the court cannot say that the State Board erred. While the repair work may not have caused the bridge to have an increased functional capacity, old parts of the bridge were replaced with new parts, and the bridge was made able to withstand a river current. These facts could lead a reasonable mind to conclude that the estimated useful life of the bridge was increased. Consequently, the State Board's determination that the repair work performed on the bridge was assessable as a "betterment" is supported by substantial evidence.

### B. Abnormal Obsolescence

■ Abnormal obsolescence is the reduction in value of property that occurs as a result of factors over which a taxpayer has no control and are unanticipated, unexpected, and cannot reasonably be foreseen by a pru-

dent businessperson prior to the occurrence. 50 I.A.C. 5.1–11–1. Abnormal obsolescence of a nonrecurring nature and includes unforeseen changes that have a direct effect on the value of property, such as unforeseen changes in market values, adverse governmental action, exceptional technological obsolescence, and destruction by catastrophe. *Id.*

In explaining why its bridge is entitled to an abnormal obsolescence adjustment, IHR states:

50 I.A.C. 5.1–6–11(a) may also be relevant to the question of the bridge insofar as it covers abnormal obsolescence. This bridge would have theoretically withstood the test of time for possibly another fifty or [one] hundred years, there's no reason why it should not, but the peculiarities of nature and the circumstances of that rerouting of the Wabash River made this into an entirely different portfolio than ever imagined. Therefore, an incredible expense was incurred by [IHR], not only because they had to replace what had been a foreseeable cost but the unforeseeable situation that the contractor would drop a pier of the bridge and also delay in getting this project done.

*Transcript of Oral Argument* at 12.

The State Board, however, insists that IHR's bridge is not entitled to an abnormal obsolescence adjustment for the March 1, 1994, assessment date. It explains that any abnormal obsolescence caused by the rerouting of the Wabash River and/or contractor negligence was cured by the repair of the bridge, and so the bridge was not affected by abnormal obsolescence on the March 1, 1994, assessment date.

The State Board is correct. The evidence shows that the bridge was repaired and fully restored to service by December, 1992. *Trial Transcript* at 25. Consequently, IHR's bridge is not entitled to an abnormal obsolescence adjustment for the March 1, 1994, assessment date.

### III

Finally, IHR maintains that even if it is liable for property taxes on the grant property and bridge work, the methodology em-

ployed by the State Board in arriving at the assessed value of that property violated Indiana law and/or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### A. The Propriety of IHR's Assessment Under Indiana Law

■ First, IHR maintains that the methodology employed by the State Board in arriving at the assessed value of the grant property and bridge work violated Indiana law. IHR explains that 3.6 million dollars of the unit value assigned to it by the State Board is directly attributable to the grant property and bridge work, which had a combined book cost of 3.6 million dollars. This, IHR contends, proves that the State Board relied solely on the book cost of the grant property and bridge work to the exclusion of all other factors, even though Indiana law required it to consider certain other factors.

To support its argument, IHR points to IND.CODE 6–1.1–8–26, which prescribes how the property of a public utility company is to be assessed. Under that statute, the State Board is first required to determine the unit value [12] of a public utility company. In determining unit value, the State Board may consider:

(1) book value;

(2) cost of replacement or reproduction, less depreciation;

(3) cost of establishing and developing the business;

(4) amount and market value or sales price of outstanding securities;

(5) valuations determined by another governmental agency or indicated by a judicial decision, including but not limited to determinations made for rate making purposes;

(6) statistics and reports prepared or filed by the company;

(7) statistics and reports prepared by another governmental agency or by a private organization if the organization is consid-

ered reliable by investors and investment dealers;

(8) earnings capitalized at a reasonable rate; and

(9) any other information which the board considers relevant.

I.C. 6–1.1–8–26.[13]

IHR contends that while I.C. 6–1.1–8–26 states that the State Board may consider the listed factors, case law actually *requires* the State Board to consider the listed factors. *See Petitioner's Post Trial Brief* at 9. In particular, IHR contends that case law requires the State Board to consider the overall profitability of a public utility company on a going concern basis. *Petitioner's Post Trial Brief* at 8–9 (citing *Western Union Telegraph Co. v. Taggart,* 163 U.S. 1, 16 S.Ct. 1054, 41 L.Ed. 49 (1896)). Consequently, IHR insists that, in assessing the grant property and bridge work, which are components of its unit value, the State Board erred by relying on book cost to the exclusion of all other factors, particularly IHR's overall profitability (or rather its lack of profitability) on a going concern basis.

Despite IHR's contention, there is no evidence before the court that 3.6 million dollars of IHR's unit value is directly attributable to the grant property and bridge work. IHR did not submit evidence showing what the State Board determined IHR's unit value to be or showing what value the State Board assigned to any of the components that made up IHR's unit value. The State Board's final determination simply states that the "grant property is properly assessable to [IHR]" and that the "$900,000 is properly assessable." *State Board's Final Determination* at 7, ¶ 6, ¶ 7. It gives no indication that 3.6 million dollars of IHR's unit value is directly attributable to the book cost of the grant property and bridge work.

Even if, however, the court were to assume for the sake of argument that 3.6 million

---

**12.** Once again, unit value is the total value of all of the property owned or used by a public utility company. I.C. 6–1.1–8–2(16).

**13.** After the State Board determines the unit value of the public utility company, it is required to subtract the value of the public utility compa-

ny's locally assessed real and personal property. I.C. 6–1.1–8–26. The resulting figure is multiplied by the adjustment factor provided in IND. CODE 6–1.1–8–12, and the result of that calculation is the value of the public utility company's distributable property. I.C. 6–1.1–8–26.

dollars of IHR's unit value was directly attributable to the grant property and bridge work, the court would still hold that State Board did not err. The evidence does not show that the State Board relied solely on the book cost of IHR's grant property and bridge work or ignored IHR's overall profitability on a going concern basis in arriving at IHR's unit value.

■ In its testimony before this court, the State Board acknowledged that book cost is used as the "basis" or "starting point" for the assessment of a public utility company's depreciable personal property, and that it considered the book cost of the grant property and bridge work. *Trial Transcript* at 40; *see also* 50 I.A.C. 5.1–6–2. This does not mean, however, that the State Board relied solely on the book cost of the grant property and bridge work. The State Board's final determination makes clear that in addition to the book cost of the grant property and bridge work, the State Board considered a report titled "The Causes of Failure of Small and Regional Railroads," as it was permitted to do under I.C. 6–1.1–8–26(7). *State Board's May 23, 1994 Final Determination* at 5. The State Board also had before it information regarding IHR's net operating income for the years 1989 through 1993, which is evidence of IHR's overall profitability during those years. *Respondent's Exhibit A* at 21 (page titled "Schedule C—Income Statement for Last Five Years"). Absent proof that the State Board intentionally disregarded IHR's net operating income, this court is bound to presume that the State Board considered it. *See State Bd. of Tax Comm'rs v. Chicago, Milwaukee, Saint Paul & Pacific R.R. Co.,* 121 Ind.App. 302, 312, 96 N.E.2d 279, 283 (1951).

In rendering its final determination, the State Board had before it a considerable amount of information regarding IHR and its property, including information regarding IHR's net operating income. Thus, even if the court were to assume that the values assigned to the grant property and bridge work, as components of IHR's unit value, were the same as that which would have resulted through the application of book cost alone, that "fact" would not be sufficient to show that the State Board did not consider the other information before it in determining either the value of the grant property or bridge work as components of IHR's unit value or IHR's unit value. *Cf. id.* (holding that the "mere fact" that the State Board's valuation was the same as that which would have resulted through the application of the depreciated replacement cost method alone was not sufficient to show that the State Board did not consider all of the evidence before it in arriving at its valuation).

■ " '[T]he failure [of a railroad] to operate at a profit is not in and of itself conclusive evidence that the assessment of its property is unreasonable, nor does it operate to relieve the railroad from paying its proportion of the public tax burden.' " *In re Assessment of Omaha, Lincoln and Beatrice Railway Co. v. State Bd. of Equalization,* 213 Neb. 71, 75, 327 N.W.2d 108, 111 (1982) (quoting *Jersey City v. State Dep't of Taxation,* 136 N.J.L. 353, 356, 56 A.2d 479, 481 (1948)). There is no evidence that the methodology employed by the State Board in determining IHR's unit value, or the value of any components thereof, violated Indiana law.

### B. The Constitutionality of the State Board's Methodology

■ Last, IHR argues that the methodology employed by the State Board in arriving at the assessed value of its grant property and bridge violates of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Specifically, IHR maintains that because the State Board relies solely on the books and records of public utility companies in assessing their depreciable personal property, the State Board treats similar properties differently.

IHR explains that if a railroad performs repair work on its lines and deducts the cost of the repair work as a business expense, then the cost of the repair work does not show up on its books and records and the repair work is not taxed. By contrast, IHR explains that if another railroad performs the exact same repair work but treats the cost of the work as a capital expenditure, the repair work is taxed because it appears on the

railroad's books and records. IHR argues that the taxation of property should not depend on a taxpayer's accounting method. Consequently, it insists that the methodology employed by the State Board in assessing the property of public utility companies is unconstitutional.

While it may be true that it is easier for the State Board to find and assess property that is recorded on a public utility company's books and records, it is untrue that property that is not recorded on a public utility company's books and records is not taxable. At trial, the State Board testified that it is aware that some property subject to taxation might not appear on a public utility company's books and records. *Trial Transcript* at 73–75. Consequently, the State Board explained that it conducts audits to, among other things, "look for omitted property." *Trial Transcript* at 73.

IHR's contention that the State Board does not tax property when its cost does not appear on a public utility company's books and records is unsupported by the evidence. The court finds no violation of the Equal Protection Clause.

### *CONCLUSION*

For the foregoing reasons, the State Board's final determination is affirmed.